GENERAL ELECTRIC COMPANY,
Appellant,

v.

Dennis CAIN, as Executor of the Estate of Daniel Cain; Mary Helen Cain; John T. Cain; Becky Cain; Vincent J. Becker; and Kathleen Becker, Appellees.

and

Debbie Ellen Rehm, Individually and as Executrix of the Estate of James David Rehm; Nicholas James Rehm, by and Through their Parent, Guardian and Next Friend, Debbie Ellen Rehm; and Christina Marie Rehm, by and Through Their Parent, Guardian and Next Friend, Debbie Ellen Rehm, Appellants,

Navistar International Corporation; Allied Chemical Corporation; American Standard; Brown & Williamson Tobacco Corporation; Colgate–Palmolive; Lorillard; E.I. Dupont; Rohm & Haas; Ford Motor; General Electric; Kentucky Utilities; Louisville Gas & Electric; Phillip Morris; Brown–Forman; Reynolds Metals; and B.F. Goodrich, Appellees.

Nos. 2004–SC–000043–DG, 2005–SC–000242–DGE.

Supreme Court of Kentucky.

Aug. 23, 2007.

As Corrected Aug. 30, 2007.

As modified on Denial of Rehearing Nov. 21, 2007.

Scott T. Dickens, Tachau, Maddox, Hovious & Dickens, PLC, Louisville, KY, Counsel for Appellant, General Electric Company and Counsel for Appellee, General Electric.

Joseph D. Satterley, Sales, Tillman, Wallbaum, Catlett & Satterley, Louisville, KY, Counsel for Appellees, Dennis Cain, Mary Helen Cain, John T. Cain, Becky Cain, Vincent J. Becker and Kathleen Becker, and Counsel for Appellants, Debbie Ellen Rehm, Nicholas James Rehm and Christina Marie Rehm.

Kenneth L. Sales, Paul Jason Kelley, Sales, Tillman, Wallbaum, Catlett & Satterley, Louisville, KY, Counsel for Appellees, Dennis Cain and Mary Helen Cain, and Counsel for Appellants, Debbie Ellen Rehm, Nicholas James Rehm and Christina Marie Rehm.

James Joseph Montgomery, Timothy C. Ammer, Elizabeth P. Sherwood, Montgomery, Rennie & Johnson, Cincinnati, OH, Counsel for Appellee, Navistar International Corporation.

Wendell S. Roberts, Donald R. Yates, II, Gray, Woods & Cooper, Ashland, KY, Counsel for Appellee, Allied Chemical Corporation.

J. Mark Grundy, Greenebaum, Doll & McDonald, Louisville, KY, Counsel for Appellee, American Standard.

William D. Grubbs, Woodward, Hobson & Fulton, LLP, Louisville, KY, Counsel for Appellees, Brown & Williamson Tobacco Corporation, Colgate–Palmolive, Lorillard and Phillip Morris.

David T. Schaefer, Anne Katherine, Guillory, Woodward, Hobson & Fulton, Louisville, KY, Counsel for Appellees, Brown & Williamson Tobacco Corporation, Lorillard and Phillip Morris.

David P. Helwig, Marks, O'Neill, O'Brien & Courtney, Pittsburgh, PA, Counsel for Appellees, Brown & Williamson Tobacco Corporation and Lorillard.

Lisa Catherine Dejaco, Wyatt, Tarrant & Combs, Louisville, KY, Counsel for Appellees, Colgate–Palmolive and Brown–Forman.

Walter M. Jones, Angela McCorkle Buckler, Wyatt, Tarrant & Combs, LLP, Louisville, KY, Counsel for Appellee, E.I. Dupont.

Cynthia Blevins, Doll Wyatt, Tarrant & Combs, Floor Louisville, KY, Counsel for Appellee, Rohm & Haas.

Byron N. Miller, Thompson, Miller & Simpson, Louisville, KY, Counsel for Appellee, Ford Motor.

Sheryl G. Snyder, Frost, Brown & Todd, LLC, Louisville, KY, Scott A. Davidson, Boehl, Stopher & Graves, Street Louisville, KY, Counsel for Appellees, Kentucky Utilities and Louisville Gas & Electric.

Rebecca F. Schupbach, Lisa Catherine DeJaco, Wyatt, Tarrant & Combs, Louisville, KY, Counsel for Appellee, Brown–Forman.

John Byron Moore, Phillips, Parker, Orberson, Moore, Louisville, KY, Counsel for Appellee, Reynolds Metals.

Rosemary D. Welsh, Vorys, Sater, Seymour, Pease, LLP, Cincinnati, OH, Counsel for Appellee, B.F. Goodrich.

Valerie F. Settles, Pacific Legal Foundation, Stuart, FL, Counsel for Amicus Curiae, Pacific Legal Foundation.

John S. Reed, II, Reed, Weitkamp, Schell, Cox & Vice, David J. Hale, Reed, Weitkamp, Schell & Vice, Louisville, KY, Counsel for Amicus Curiae, Kentucky Chamber of Commerce, Associated Industries of Kentucky, Greater Louisville, Inc., and Coalition for Litigation Justice, Inc.

## OPINION OF THE COURT

The plaintiffs assert that they (or their decedent) contracted an occupational disease as a result of exposure to asbestos while performing work for their direct employers on premises owned by the various businesses ("premises owners") named as defendants in these cases. At issue, however, is not whether the owners must pay workers' compensation benefits to the plaintiffs, but whether the "exclusive remedy" provision in KRS 342.690(1) immunizes the owners from tort liability for the occupational diseases that the plaintiffs claim were caused by the owners' respective negligent acts or omissions.

As these cases were resolved by summary judgment, the Jefferson Circuit Court did not reach the issues of negligence, causation, or damages. The summary judgment did, however, address the issues of "exclusive remedy" immunity, the constitutionality of such immunity under the "jural rights" doctrine, and whether the premises owners had proven that each had "secure[d] ... payment of compensation" as required by KRS 342.340. In its judgments, the circuit court found in favor of all of the owners, holding that they were "contractors" immune from tort liability, that the exclusive remedy provision was not unconstitutional, and that each owner had sufficiently proven that it has secured payment of compensation per KRS 342.340.

In case No.2004–SC–0043–DG (hereinafter the "G.E. case") one panel of the Court of Appeals reversed the Circuit Court, holding that General Electric Company ("G.E.") was not a "contractor" as defined

by KRS 342.610(2)(b) when the plaintiffs, Daniel Cain, John Cain and Vincent Becker, were allegedly exposed to asbestos while working on its premises. It also held there was a material issue of fact as to whether G.E. had secured Workers' Compensation coverage as required by KRS 342.690(1). For the reasons set forth herein, we have concluded: 1.) that summary judgment for G.E. was improper because the available evidence inadequately supported the trial court's finding that the plaintiffs performed work of a kind that was a regular or recurrent part of the work of G.E.'s business, and 2.) that documented evidence of workers' compensation coverage, absent some evidence to the contrary, is sufficient proof of workers' compensation coverage for the purpose of summary judgment. Therefore, we affirm on Issue 1, reverse on Issue 2, and remand the case to the Jefferson Circuit Court for further proceedings.

In case No.2005–SC–0242–DG (hereinafter the "Rehm case"), another panel of the Court of Appeals affirmed the circuit court, holding that each of the sixteen premises owners was a "contractor" as defined by KRS 342.610(2)(b), when the plaintiffs' decedent, James David Rehm, was exposed to asbestos while working on each of their premises. Under the facts presented, this panel also held that "exclusive remedy" immunity as embodied in KRS 342.610 and 342.690 is constitutional and does not transgress the "jural rights" doctrine. They further disagreed with the panel in the G.E. case and held that documentary proof of workers' compensation coverage, absent proof to the contrary, presented no issue of material fact as to coverage. For the reasons set forth herein, we conclude: 1.) that the evidence does not support the Circuit Court's conclusion that Rehm performed work of a kind that was a regular part of the work of the premises owners' businesses in every in-

stance that he worked on each premises; 2.) that documented evidence of workers' compensation coverage, absent some evidence to the contrary, is sufficient proof of workers' compensation coverage for summary judgment; and 3.) that "exclusive remedy" immunity under the Kentucky Workers' Compensation Act does not violate the "jural rights" doctrine. Therefore, we affirm in part and reverse in part on Issue 1, affirm on Issues 2 and 3, and remand the claims against seven of the premises owners to the Jefferson Circuit Court for further proceedings.

## I. "EXCLUSIVE REMEDY" IMMUNITY

### A. STATUTORY BASIS

KRS 342.690(1) provides, in pertinent part, as follows:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee.... For purposes of this section, *the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610,* whether or not the subcontractor has in fact, secured the payment of compensation. (emphasis added.)

KRS 342.610 identifies those employers who are liable for payment of workers' compensation benefits to employees who suffer work-related injuries or occupational diseases. It provides, in pertinent part:

> (1) Every employer subject to this chapter shall be liable for compensation for injury, occupational disease, or death without regard to fault as a cause of the injury, occupational disease, or death.

(2) *A contractor* who subcontracts all or any part of a contract and his carrier *shall be liable for the payment of compensation to the employees of the subcontractor* unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter A person who contracts with another:

. . .

(b) To have *work* performed *of a kind which is a regular or recurrent part of the work of the trade, business occupation, or profession* of such person shall for the purposes of this section be deemed a contractor, and such other person a subcontractor .... (emphasis added.)

■ If premises owners are "contractors" as defined in KRS 342.610(2)(b), they are deemed to be the statutory, or "up-the-ladder," employers of individuals who are injured while working on their premises and are liable for workers' compensation benefits unless the individuals' immediate employers of the workers have provided workers' compensation coverage. If deemed to be "contractors," the owners, like any other employers, are immune from tort liability [exclusive remedy immunity] with respect to work-related injuries whether or not the immediate employer actually provided workers' compensation coverage. *See* Thomas M. Cooper, *The "Comp" Factor in Tort Cases,* 51 Ky. Bench & Bar, No. 1, Winter 1987, at 14, 37. Thus, whether an owner is entitled to "exclusive remedy" immunity depends upon whether the worker was injured while performing work that was "of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession" of the owner. If so, the owner is immune; if not, the owner is subject to tort liability.

■ Consistent with the principles expressed in *Shamrock Coal Co., Inc. v. Maricle,* 5 S.W.3d 130, 133 (Ky.1999), and *Gordon v. NKC Hospitals, Inc.,* 887 S.W.2d 360, 362 (Ky.1994), a premises owner who asserts exclusive remedy immunity must both plead and prove the affirmative defense. Even when the underlying facts are undisputed, a conclusion that a defendant is entitled to judgment as a matter of law must be supported with substantial evidence that a defendant was the injured worker's statutory employer under a correct interpretation of KRS 342.610(2)(b). *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky.1986). Statements that amount to legal conclusions are not properly included in an affidavit and, in any event, are not substantial evidence. 2A C.J.S. *Affidavits* § 39 (2006). Substantial evidence that a defendant was an injured worker's statutory employer entitles the defendant to prevail as a matter of law unless the plaintiff goes forward with contrary evidence.

## B. CASE LAW

### 1. Kentucky Cases

Kentucky case law interpreting KRS 342.610(2)(b) is limited to two primary Supreme Court opinions and three Court of Appeals opinions. Noting in *Elkhorn–Hazard Coal Land Corp. v. Taylor,* 539 S.W.2d 101, 103–4 (Ky.1976), that an owner ordinarily is not liable for workers' compensation benefits to the employee of an independent contractor, this court explained that the statute's purpose is to discourage a contractor from subcontracting work that is a regular or recurrent part of its business to an irresponsible subcontractor in an attempt to avoid the expense of workers' compensation benefits. The court then held that a lessor of mineral rights to coal was not liable for payment

of workers' compensation benefits to the lessee's employees because the lessor was in the business of leasing, not mining. In *Fireman's Fund Insurance Co. v. Sherman & Fletcher*, 705 S.W.2d 459, 462 (Ky. 1986), the court held that an employee of a rough framing subcontractor who was killed while performing that work on premises owned by a business engaged in constructing a building complex thereon was the premises owner's statutory employee because the owner was in the building construction business and "rough framing carpentry is work of a kind which is a regular or recurrent part of the work of the business of building construction." And, albeit in dicta, the court in *Krahwinkel v. Commonwealth Aluminum Corp.*, 183 S.W.3d 154, 158 n. 5 (Ky.2005), expressed the view that the installation of a "fluid capture system was not 'a regular or recurrent' part of Commonwealth's business, trade or occupation."

In *Tom Ballard Co. v. Blevins*, 614 S.W.2d 247 (Ky.App.1980), a coal mining company was under contract to sell and deliver coal to its customers. The Court of Appeals held that the mining company was the statutory employer of truck drivers, employed by a contractor and hired by the mining company to haul the coal to the coal company's customers, because delivering the coal to its customers was a regular or recurrent part of the business of the mining company under its contracts to both mine and deliver. *Id.* at 249. Under similar reasoning, in *Wright v. Dolgencorp, Inc.*, 161 S.W.3d 341, 344 (Ky.App.2004), the Court of Appeals held that an employee of a trucking company hired to haul merchandise from a business retailer's main distribution center to its retail stores was the statutory employee of the retailer.

In *Daniels v. Louisville Gas & Electric Co.*, 933 S.W.2d 821 (Ky.App.1996), the Environmental Protection Agency (EPA) had ordered LG & E and other coal-fired utility companies to conduct emissions testing of its coal-fired furnaces on specified occasions. LG & E contracted with an emissions testing company to conduct the tests, and an employee of that company was severely burned while conducting such tests at the LG & E plant. Because the EPA required LG & E to conduct the emissions testing upon the occurrence of specified events, the Court of Appeals held that the emissions tests were a regular or recurrent part of LG & E's business. *Id.* at 823–24. The holding in *Daniels* is consistent with the previous holding in *Blevins*. In *Blevins*, the work performed by the injured worker became a part of the mining company's business by contract, whereas in *Daniels*, it became a part of the utility company's business by law.

In *Daniels*, 933 S.W.2d at 824, the Court of Appeals also formulated definitions of "regular" and "recurrent," *viz.*:

> "Recurrent" simply means occurring again or repeatedly. "Regular" generally means customary or normal, or happening at fixed intervals. However, neither term requires regularity or recurrence with the preciseness of a clock or calendar.

Thus, the court construed "regular" to apply not only to the nature of the owner's business but to the frequency of the occurrence of a need to perform the work in question. As so defined, "regular" and "recurrent" are almost redundant.

■ *Webster's New College Dictionary* 928 (1995), defines "recurrent" as "occurring or appearing again or repeatedly," which would apply to, *e.g.*, routine maintenance. It defines "regular" as "customary, usual or normal." *Webster's, supra*, at 934. Therefore, as used in KRS 342.610(2)(b), "regular" means that the type of work performed is a "customary, usual or normal" part of the premises own-

er's "trade, business, occupation, or profession," including work assumed by contract or required by law. "Recurrent" means that the work is repeated, though not "with the preciseness of a clock." *Daniels*, 933 S.W.2d at 824.

## 2. Federal Cases Construing Kentucky Law

There are more federal than Kentucky cases construing KRS 342.610(2)(b). Although the Sixth Circuit lamented in *Thompson v. The Budd Company*, 199 F.3d 799, 805 (6th Cir.1999), that "Kentucky cases have not mapped precisely the contours of section 342.610," the federal cases are consistent with the holdings in Kentucky cases.[1] Most illustrative are the two U.S. District Court cases that were cited recently in *Krahwinkel*, 183 S.W.3d at 158 n. 5, *viz.: Gesler v. Ford Motor Co.*, 185 F.Supp.2d 724, 728 (W.D.Ky.2001) (demolition and removal of automobile body anti-corrosion system so that new system could be installed in its place held not to be a regular or recurrent part of automobile manufacturer's business); *Sharp v. Ford Motor Co.*, 66 F.Supp.2d 867, 869–70 (W.D.Ky.1998) (loading and unloading

Ford's vehicles at its plant by contractor's employees held to be a regular or recurrent part of Ford's business). Quite clearly they also support the principle that "[t]he humane spirit of the statute [Kentucky Workers' Compensation Act] does not warrant its extension beyond its legitimate scope." *Gateway Const. Co. v. Wallbaum*, 356 S.W.2d 247, 249 (Ky.1962). The purpose of KRS 342.610(2)(b) is not to shield owners or contractors from potential tort liability but to assure that contractors and subcontractors provide workers' compensation coverage. *See Elkhorn–Hazard Coal Land Corp. v. Taylor, supra.*

## C. OTHER AUTHORITY

Guidance for determining the work of a business is found in Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law*, § 70.06[3] (2006), which states:

> [T]he test must be relative, not absolute, since a job of construction or repair that would be a nonrecurring and extraordinary undertaking for a small business might well for a large plant be routine activity which it normally expects to

---

1. *E.g., Thompson v. The Budd Co., supra,* (KRS 342.610 encompassed the regular maintenance of a manufacturer's physical plant as well as activities required to conform to applicable governmental regulations, and changing air conditioning filters was a regular element of Budd's plant maintenance.); *Granus v. N. Am. Philips Lighting Corp.*, 821 F.2d 1253, 1257 (6th Cir.1987) (employee injured while performing what opinion describes as "routine maintenance" (rebricking) of inside of melting furnace at a glass-making factory held to be statutory employee of owner; rebricking occurred at four year intervals); *Franke v. Ford Motor Co.*, 398 F.Supp.2d 833, 839 (W.D.Ky.2005) (employee of contractor injured while installing hydraulic lift table in a concrete pit at Ford plant (500 lift tables in plant) held to be statutory employee of Ford where Ford often used its own employees to install hydraulic lifts but had a "Construction Commodity Management" contract with the worker's direct employer whereby that employer would perform the work during "compression time" when there were insufficient Ford employees available to do the work and worker's employer maintained a permanent construction trailer on Ford's property for use in performing this contract); *Davis v. Ford Motor Co.*, 244 F.Supp.2d 784, 789–90 (W.D.Ky.2003) (Ford, purchaser of component parts from parts manufacturer, held not to be statutory employer of part manufacturer's employee hurt on Ford's transport rack while packaging parts for shipments at manufacturer's plant); *Smothers v. Tractor Supply Co.*, 104 F.Supp.2d 715, 718 (W.D.Ky.2000) (truck drivers who transported merchandise from retail business's warehouse to its storerooms held to be statutory employee of retailer).

cope with through its own employed staff. Ordinarily construction work, such as building a factory structure, installing a conveyor system, moving laboratory equipment, putting in new partitions, making electrical installations, road widening, excavating, replacing a heating system, inspecting elevators, changing the pipes, putting in a septic tank, bricking up the windows, replacing the floor, building a fence, building a canopy for a small grocery store, or replacing shoe racks, would be considered outside the trade or business of a manufacturing or mercantile establishment. But if the defendant is a business which by its size and nature is accustomed to carrying on a more or less ongoing program of construction, replacement, and maintenance, perhaps even having a "construction division," or which can be shown to have handled its own construction in the past, a job of construction delegated to a contractor will be brought within the statute. (footnotes omitted.)

The treatise notes that, "with a surprising degree of harmony," the courts agree on a general rule of thumb that a statute deeming a contractor to be an employer "covers all situations in which work is accomplished which this employer, or employers in a similar business, would ordinarily do through employees." *Larson's, supra,* at § 70.06[1].

### D. CONCLUSION

Work of a kind that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" of an owner does not mean work that is beneficial or incidental to the owner's business or that is necessary to enable the owner to continue in business, improve or expand its business, or remain or become more competitive in the market. *Larson's, supra,* at § 70.06[10]. It is work that is customary,

usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees.

■■ The test is relative, not absolute. Factors relevant to the "work of the ... business," include its nature, size, and scope as well as whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform. *Larson's, supra,* at § 70.06[5]. Employees of contractors hired to perform major or specialized demolition, construction, or renovation projects generally are not a premises owner's statutory employees unless the owner or the owners of similar businesses would normally expect or be expected to handle such projects with employees. Employees of contractors hired to perform routine repairs or maintenance that the owner or owners of similar businesses would normally be expected to handle with employees generally are viewed as being statutory employees. Whether a project is customized to the premises owner's needs is irrelevant.

■■ When characterizing a project as being routine repair or maintenance versus a capital improvement, a relevant consideration is whether the premises owner capitalized and depreciated its cost for tax purposes or deducted its cost as a business expense. Capitalized costs tend to indicate that the business was not the injured worker's statutory employer, while expensed costs tend to indicate that the owner was the statutory employer. This factor is not conclusive, however, because even projects performed entirely with a premises owner's workforce may be capitalized depending on their character. It is irrelevant when a contractor's employees

are used to supplement the premises owner's workforce. Stated simply, KRS 342.610(2)(b) refers to work that is customary, usual, normal, or performed repeatedly and that the business or a similar business would perform or be expected to perform with employees.

## II. JURISDICTIONAL FACT—JURY QUESTION OR SUMMARY JUDGMENT?

Relying on dicta found in *Goldsmith v. Allied Building Components*, 833 S.W.2d 378, 381 (Ky.1992), the Rehm case plaintiffs assert that a jury must determine if the premises owners were statutory employers (*i.e.*, contractors). We disagree.

■■■ The plaintiffs' tort claims are a kind of case that comes within a circuit court's subject matter jurisdiction. But if Rehm was injured while working as a premises owner's employee under KRS 342.610(2)(b), that jurisdictional fact would deprive the circuit court of subject matter jurisdiction by operation of KRS 342.690(1). In *Robinson v. Paxton*, 210 Ky. 575, 276 S.W. 500, 502 (1925), the court rejected the assertion that a jurisdictional fact must be tried before a jury. *See also* 21 C.J.S. *Courts*, § 15 (2007). *Collins v. Duff*, 283 S.W.2d 179, 182 (Ky.1955), explained subsequently that "where the jurisdiction of the court depends upon a fact which the court is required to ascertain, the court has jurisdiction to determine that jurisdictional fact, and its judgment determining that fact is conclusive on the question of jurisdiction until set aside or reversed by direct proceedings. . . ." *See also Ohio River Contract Co. v. Gordon*, 170 Ky. 412, 186 S.W. 178, 182 (1916), ("In the case at bar, it appears that the respondent [trial judge] has already heard and decided, in the court over which he presides, the issues made as to the jurisdiction of the person and subject matter of the action in

due course of judicial procedure, and before the petition herein was filed. These were mixed questions of law and fact. The judge . . . must necessarily exercise his judicial discretion and hear and decide the issues."). The construction and application of a statute is a matter of law that is reviewed *de novo*. *Bob Hook Chevrolet Isuzu Inc. v. Commonwealth, Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky.1998).

The underlying facts in the Rehm case were undisputed. It was their legal significance under KRS 342.610(2)(b), KRS 342.290(1), and the parties' evidentiary burdens that were at issue. Those were questions for the trial court to decide, subject to *de novo* review.

## III. APPLICATION

### A. The G.E. Case No.2004–SC–000043–DG

■■■ G.E. manufactured household appliances at a multi-building facility in Louisville, Kentucky, known as "Appliance Park." Construction on the facility began in the early 1950s, and expansions occurred at various times thereafter. The three plaintiffs claim that they contracted asbestosis as a result of exposure to asbestos while working for contractors on major construction and installation projects at Appliance Park at various times from 1950 through 1984. One plaintiff also claims to have been exposed to asbestos during a short period of work at a G.E. facility in Mt. Vernon, Indiana. None worked directly for G.E.

Daniel Cain (who died during the pendency of this action) testified that he began working as a plumber/pipefitter in 1948 and worked for James E. Smith Company, installing plumbing in newly constructed buildings at Appliance Park in the 1950s. He later installed new equipment in the "washer building."

John Cain testified that he worked as a plumber/pipefitter for John L. Zehnder Company at Appliance Park from August 1966 to February 1967, helping to install a furnace that was used to bake enamel onto appliance parts. He later worked for James E. Smith Company at Appliance Park for approximately one year during 1969–1970, installing the underground plumbing system, medical gas lines, water lines, and glass piping for a new building (a laboratory). Following the completion of that project, he worked at Appliance Park "a couple of times a year" during shutdowns from 1971 through 1973 or 1974, performing pipe-fitting work in multiple buildings.

Vincent Becker is an iron-worker who worked "pretty often" at Appliance Park for various companies over a thirty-two year period through 1984. His work involved erecting and insulating structural steel for buildings, constructing mezzanine floors within buildings, and removing and installing conveyor systems and other equipment used in G.E.'s manufacturing processes. He also did iron-working for "a couple of days" at a washing machine manufacturing plant that G.E. owned in Mt. Vernon, Indiana.

After the plaintiffs were deposed, G.E. filed motions for summary judgment in which it raised an exclusive remedy immunity defense. But it failed to submit any evidence. Nonetheless, the trial court granted judgment in its favor after determining that the construction and installation projects on which the plaintiffs worked were a regular or recurrent part of the work of G.E.'s business because G.E. could not manufacture appliances without plant buildings, plumbing, and conveyor systems. This appeal is taken from a Court of Appeals decision to reverse in that regard.

Facially, the plaintiffs' tort claims were of a type that comes within a circuit court's subject matter jurisdiction. As the party asserting that the circuit court lacked subject matter jurisdiction over these particular claims, G.E. had the burden to prove that it was a contractor under KRS 342.610(2)(b) and, therefore, that the plaintiffs were its statutory employees. The circuit court erred in concluding that G.E. was entitled to a favorable finding under KRS 342.610(2)(b) because the record developed at that point contained no substantial evidence that the plaintiffs performed regular or recurrent work of a type that G.E. or similar businesses would perform or be expected to perform with employees. Therefore, the claims must be remanded for further proceedings. On remand, the parties will have an opportunity to present further proof regarding the nature of G.E.'s business and whether the work that the plaintiffs performed was a regular or recurrent part of its business under KRS 342.610(2)(b).

### B. The Rehm Case No.2005– SC–000242–DGE

James David Rehm died during the pendency of this action of malignant mesothelioma, a form of cancer caused by exposure to asbestos. His wife was later substituted as the plaintiff. In an affidavit and deposition, Rehm stated that from 1975 through 1982 he was exposed to asbestos while employed as a millwright by Rapid Installation Company ("Rapid") working on projects at locations owned by sixteen different companies. He stated that the projects on which he worked were customized, did not occur at fixed intervals, and were not regular and/or routine maintenance for the companies. He also stated that each company employed a staff for performing regular maintenance but admitted subsequently that he had no per-

sonal knowledge of any of the companies' maintenance practices.

Early in the discovery process, some defendants filed motions for protective orders. The trial court limited discovery to matters concerning the exclusive remedy defense and directed all defendants to file a motion for summary judgment. They did so, supporting their motions with affidavits. The plaintiffs submitted opposing affidavits, after which the parties took additional proof, including the depositions of all witnesses. When proof was complete, they submitted briefs. The trial court concluded from the evidence that Rehm's work was a regular or recurrent part of each defendant's business and granted each defendant's motion. This appeal is taken from the Court of Appeals' decision to affirm in that regard.

Richard Sweazey, Mark Draper, and Rick Williams provided affidavits, stating that they were millwrights employed by Rapid who sometimes worked with Rehm. They indicated that each company's maintenance staff performed the regular and recurrent type of work; whereas, Rapid's work did not occur at fixed intervals and involved customized projects, not regular and routine maintenance. They testified subsequently to having no personal knowledge of the companies' maintenance practices except in a few specific instances. Williams stated that many of the projects on which they worked involved major demolition or conveyor changeovers, were large in scope, and involved several Rapid employees.

Don Boaz, a mechanical engineer who had worked at Rapid since 1973, also provided an affidavit and was deposed. Boaz had worked for Brown and Williamson from 1965–67 and for American Standard from 1967–73, progressing from project engineer, to maintenance superintendent, to plant superintendent. He testified that

Rapid fabricated and installed conveyors and other machinery, but it also sold other manufacturers' equipment. Boaz acknowledged that some of Rapid's work could be considered repair or maintenance but stated that the company did not normally perform such work. He testified specifically about Rapid's work for some defendants but had no personal knowledge of the work that Rehm performed.

Kenneth Sheets provided an affidavit and was deposed. He worked a journeyman millwright for Rapid from 1969–79 and eventually became its executive vice-president. Sheets characterized Rapid as being a construction company that fabricated and installed machinery, conveyors, structural steel, automatic retrieval systems, and rack systems to its customers' specifications. He testified about the specific work that Rapid performed at several defendants' premises and explained that its employees worked on "composite" crews of individuals from different trades because union rules limited the types of work that a particular trade could perform. He also explained that the term "burn down" referred to the process of demolishing existing equipment in preparation for re-tooling. Unions imposed no trade restrictions on a burn down.

James O. King, Jr., a certified public accountant since 1976 and a former audit supervisor at Ernst & Young, prepared an affidavit and was deposed. King's affidavit states his opinions that (1) "major tear downs and renovations of portions of industrial plants are capital expenditures subject to depreciation and are not properly classified as a regular and recurrent expense of a manufacturing plant;" (2) "a regular and recurrent operating expense would not be a capital improvement and not subject to depreciation;" (3) "[a]ny item which would be categorized as a capital expenditure would therefore not fall

within the category of a regular and recurrent operating expense from an accounting standpoint;" and (4) "[t]hose items which are expense items and not subject to depreciation would be the regular and recurrent portion of the manufacturing business."

Rehm submitted the affidavit of Dr. Suraj M. Alexander, professor and chairman of the department of industrial engineering at the University of Louisville since 1995. Alexander stated that he had no personal knowledge of any of the defendants' maintenance procedures. Based on his training and experience, his review of the affidavits and depositions filed in support of and against the motions for summary judgment, and his review of Rapid's "statement of experience" records, it was his opinion that major capital expenditures for renovations "would not be regular and recurrent at a specific plant."

After discovery was complete, the trial court concluded that each defendant was entitled to judgment as a matter of law. We will address (in alphabetical order) the evidence of record regarding the nature of each owner's business during the relevant period and the nature of the work that Rehm helped to perform for each owner, and we will determine whether the trial court applied KRS 342.610(2)(b) correctly when deciding that each company was Rehm's "up-the-ladder" employer as a matter of law.

### 1. Allied Chemical Corporation

■ Allied Chemical processed coal into coke and various by-products at its Ashland plant. Rehm testified that he worked at the plant once, for about two months as part of a composite crew of twenty. It occurred during a scheduled shut-down and re-tooling of a portion of the plant. He stated that he helped demolish, remove, and replace 10–15 pump and motor assemblies. No Allied employees helped with the work.

Allied's former superintendent of maintenance and engineering, H.D. Fuller, provided an affidavit and was deposed. He had worked for the company in various capacities from 1948–78. Fuller testified that the plant contained 100–150 pump and motor assemblies of all sizes as well as the associated piping. He could not state precisely how often pumps would be torn out and reinstalled because it "was just part of the operation." He explained that it might occur one day and again the next, then not for a period of time, and then a whole series might be done. Asked why Allied would use an outside contractor for a project rather than employees, he stated that the decision would depend on factors such as the project's size, the staffing available at the plant, and the time in which the job must be completed. Normally outside contractors would be used for larger projects, but Allied's employees could also do part of the work. He recalled that three major projects were performed between 1977 and 1981. The Sulfaban and Minister Stein projects were new. Only the project on coke oven battery # 4 involved a teardown and re-build, but the project would have involved more than 10–15 pumps and could not have been performed in 6–8 weeks.

Fuller's testimony provided substantial evidence that the removal and replacement of pump and motor assemblies occurred repeatedly and was work that Allied performed with employee millwrights, even on some large projects for which it also used outside contractors. Although no Allied employees helped with the project on which Rehm worked, the plaintiffs submitted no evidence that it was significantly different from the projects on which Allied employees worked or that such a project was not regular or recurrent at Allied.

Thus, Allied was Rehm's statutory employer under KRS 342.610(2)(b) and entitled to judgment as a matter of law.

### 2. American Standard, Inc.

American Standard manufactured cast iron bathtubs, lavatories, and sinks. Rehm testified that he worked at the company's plant on about six different occasions for a total of about six months. He helped to tear out and re-route a conveyor in the foundry and repair or replace the conveyor's chain; he installed machinery in the faucet facility and connected the machinery as well as pipes, motors, and pumps to a conveyor; and he worked on the conveyor line that ran from the foundry into the enamel shop. He also stated that he worked on furnaces and helped to repair cupolas in which scrap iron was melted. He explained that the steel shell of a cupola would sometimes burn through and that the area would have to be removed and replaced with new steel.

Janice McMonigal, an administrative secretary in American Standard's engineering and maintenance department from 1975 to 1982, worked with engineers who hired outside contractors. Later, she became the plant's Environmental Safety Coordinator and eventually the Facility Manager. Testimony from her affidavit and deposition indicated that a staff of about 100 employees performed daily maintenance, but outside contractors such as Rapid were hired for specialized jobs and jobs needing immediate attention that the regular maintenance staff was too small, too busy, or unable to handle alone. Major maintenance was required at least annually and usually was performed during the three-week winter or summer shut-down.

Kenneth Sheets testified that Rapid employees performed work at American Standard more than 50 times between 1975 and 1982. The size of the crew varied with the project but could reach 50–60 during a shut-down. At such times, American Standard's maintenance and engineering staff would remain at the plant. Sheets testified that Rapid employees repaired and rebuilt the sand-handling system in the foundry, explaining that it "was hard and hot work. They don't want to do it, so they give it to us." Rehm was on that crew "every once in a while." Rapid employees also worked on the plant's conveyors "[t]hroughout the year," welded thick steel plates into the bottom of the furnaces in the enamel room, and were always "patching things up, keeping them running." They usually performed work that American Standard's maintenance staff "didn't want to do, or didn't have the capability to do, or didn't have the time to do." Sheets did not know how often a cupola lining had to be repaired or replaced. He stated that American Standard employees did routine maintenance on the conveyors, but Rapid would come in "when they had to make a quick change."

Don Boaz testified that when he was maintenance superintendent American Standard's maintenance staff repaired equipment "from a duct conveyor, to a cupola, to a building, to a road." Asked if that included pumps, motors, furnaces, and cupolas, he replied, "Yes, it did." Rapid's "Statement of Experience" listed a $1,136,000.00 contract involving structural steel and conveyors that was completed in 1980. Boaz did not recall the contract but was certain from the dollar amount that it involved multiple projects. He had no reason to disagree with Sheets' testimony regarding the number of times that Rapid worked at the plant from 1975 to 1982.

There was substantial evidence that Rehm performed work that was regular or recurrent at American Standard, but no substantial evidence showed that all of the

work he performed was of a kind that American Standard or similar businesses would normally perform or be expected to perform with employees. Ms. McMonigal acknowledged that Rapid's employees performed certain "specialized projects" and work that American Standard's maintenance staff was unable to handle, and Mr. Sheets testified that Rapid performed work that the staff lacked the capability to perform. There was substantial evidence that American Standard employees performed conveyor maintenance work and repaired cupolas. But they did not work on the sand system, and nothing indicated that they or the employees of a similar business would normally remove, re-route, and install conveyors or that they would install machinery and connect it and the related pumps, motors, and pipes to a conveyor. Therefore, the trial court erred in concluding that American Standard was entitled to judgment as a matter of law regarding the latter kinds of work. The claim must be remanded to the trial court for further proceedings.

### 3. Brown and Williamson Tobacco Corporation

██ Brown and Williamson (B & W) manufactured tobacco products. Rehm worked at B & W for a total of about two months over a period of five to seven years, on two to three different jobs. He tore out conveyor lines, pipes, insulation, machinery, and other equipment and installed new conveyors and machines. No one from B & W was present. Rapid's records indicated that it charged B & W $200,000.00 for moving equipment and machines and $225,000.00 for installing special "auto lifts," both of which were completed in 1982.

An affidavit from Thomas L. Sarver, an engineer at the facility from 1963 to 1982, stated that the maintenance, repair, and replacement of machinery were regular and recurrent parts of the company's business. When deposed, Sarver testified that he was in charge of maintenance and all new work at the B & W facility until 1982, when he became a corporate project engineer. He stated that a B & W employee drafted plans and specifications for conveyors and that the engineering department made them "from scratch" in one of the shops at the facility, but he recalled purchasing a conveyor from an outside contractor "in about 1983." Sarver testified that outside help was usually unnecessary because B & W had a maintenance staff of about 680 employees, who performed normal and routine maintenance, normally did tear-outs, and performed 90% of "special repairs" and modifications to existing equipment. Sometimes outside contractors installed new equipment

Sarver's testimony provided substantial evidence that Rehm performed regular or recurrent work of a kind that B & W normally performed with employees. Because there was no substantial evidence that any project on which Rehm worked was significantly different from those that B & W employees performed, B & W was Rehm's statutory employer and entitled to judgment as a matter of law.

### 4. Brown–Forman Corporation

██ Brown–Forman manufactures and sells alcoholic beverages, luggage, and Lenox china. Rehm testified that sometime between 1975 and 1982 he helped to demolish a bottling line and install a new one at a Brown–Forman distillery in the Shively area. The six-week project required old piping, plumbing, and machinery to be removed and replaced. When deposed, Rehm testified that he removed and replaced some of the equipment on the bottling line, rather than the entire line.

Brown–Forman maintained that it never operated a bottling line at the Shively distillery and that its only Louisville bottling line during the relevant period was located at its Howard Street facility; however, that fact is not material presently. Gerald Hubbs, a mechanical engineer who had worked for the company since 1967 and was familiar with the company's renovation and engineering projects, provided an affidavit and was deposed. He stated that sixteen engineering projects were performed from 1975 to 1982 regarding the Howard Street bottling lines. Some were performed entirely by Brown–Forman employees and some were performed, in whole or in part, by outside contractors. Brown–Forman did not consider any of the projects to be routine maintenance. Hubbs stated that it was normal and customary for Brown–Forman to renovate its bottling lines from time to time, using either employees or an outside contractor. The projects were not performed at fixed intervals but were usually scheduled during shutdowns for the Christmas holidays or summer vacations. Each project included installing or replacing equipment, usually on a single bottling line. Brown–Forman renovated one or more bottling lines on an annual or semiannual basis.

Hubbs' testimony provided substantial evidence that renovating bottling lines, which included removing and replacing machinery and equipment, was a regular or recurrent activity that Brown–Forman normally performed with employees. No evidence indicated that the project on which Rehm worked was significantly different from those that Brown–Forman employees performed. In fact, his description of it matched almost exactly the projects that Hubbs described. Thus,

Brown–Forman was Rehm's statutory employer and entitled to judgment as a matter of law.

### 5. Colgate–Palmolive Company

■ Colgate–Palmolive manufactured detergents, soaps, and toothpaste. Rehm testified that he worked at the company's Louisville-area cleaning and hygiene products plant[2] for approximately six weeks on two or three separate occasions. On each occasion he removed and replaced old equipment, specifically "[m]achinery, pipes, boilers, just every type of equipment that was used in the process of making whatever they were making." Rehm also testified that Colgate–Palmolive employees did not help. Business records indicated that Rapid completed a $257,300.00 structural steel project at Colgate–Palmolive in 1980 and a $200,000.00 pollution control project in 1981.

A deposition and affidavit from facilities manager/plant engineer, Michael Hubbs, indicated that Colgate–Palmolive's manufacturing process used machinery, equipment, and their component parts, which had to be maintained, repaired, and/or replaced regularly. The affidavit stated in a conclusory manner that while certain jobs were large, capitalized projects, such renovation and repair projects were a regular or recurrent part of Colgate–Palmolive's business.

When deposed, Hubbs testified that Colgate–Palmolive removed old equipment and installed new equipment on an ongoing basis. He stated that Colgate–Palmolive employees did not fabricate conveyors but that they did assemble conveyor equipment, noting that "one-third of [the] main-

---

**2.** The plant in question is located in Jeffersonville, Indiana. Thus, there is some question whether the Kentucky courts (or the Kentucky Workers' Compensation system, for that mat- ter) are the proper forum in which to address complaints related to the Colgate–Palmolive plant. However, none of the parties has raised the issue, so we will not address it.

tenance group ... did different projects along those lines." Work contracted to Rapid usually involved the renovation or replacement of part or all of a conveyor system. He explained that Rapid would make or renovate a conveyor system and deliver the unassembled system, which Colgate–Palmolive employees would assemble on the premises. Hubbs stated that Rapid also installed some storage tanks and moved a boiler. When asked about a project that involved installation of a conveyor near critical parts of a finishing line, Hubbs indicated that Colgate–Palmolive employees performed the job and stated, "[W]e normally don't let contractors get into that portion of our equipment right there at the finishing line.... [W]e do that work better than a contractor.... [W]e have the expertise and knowledge of how to put it in and make it work properly." Hubbs also testified that Colgate–Palmolive employees performed demolition and installation, which was not specialized work, and also worked on storage tanks. The company used its own cranes on some projects but had Rapid do projects that required large pieces of equipment to be moved because it had larger cranes. However, no one testified that Rehm was involved in such a project.

Hubbs's testimony provided substantial evidence that not only did Colgate–Palmolive use employees to perform demolition and installation projects, it dedicated a significant portion of its maintenance staff to doing such projects. There was no evidence that the projects Rehm described were significantly different from those that Colgate–Palmolive performed with employees. Thus, Rehm was Colgate–Palmolive's statutory employee. It was entitled to judgment as a matter of law.

### 6. E.I. DuPont de Nemours and Company

■ DuPont manufactured and sold chemicals and related products between 1975 and 1982. Rehm's affidavit stated that he worked at DuPont for approximately three months removing insulated pipes, pumps, steel, and other equipment. He testified subsequently that he removed, maintained, replaced, and installed pumps, motors, and piping at the facility; that he entered the facility through a construction gate; and that there were a lot of Rapid employees at the job site. Another Rapid employee testified that he worked with Rehm for a few days at the DuPont facility, grinding and leveling concrete pads. Rapid's business records indicate that it completed a $237,000.00 conveyor structural steel job at DuPont in 1980 and a $1,300,000.00 job fabricating and erecting steel in 1981.

Rehm stated that he had worked on the company's baghouse project when opposing DuPont's motion for summary judgment. DuPont asserted, however, that the project was new construction and performed exclusively by its Construction Division. As noted in the trial court's opinion and order, Rehm conceded on cross-examination that he did not work on the project.

Terry L. Tempel, who had worked at the DuPont facility since 1974, provided two affidavits and was deposed. He testified that during the 1970's and 1980's DuPont had its own Construction Division, which was responsible for constructing new plants, new facilities at existing sites, and replacing existing facilities. The company used both its own employees and contract employees for construction projects and to perform tasks such as maintaining, replacing, and installing pumps, motors, and pipes, including work with flanges and gaskets. He characterized this work as being "routine maintenance," stated that it was ongoing and occurred frequently, and

stated the Rapid was one of the companies with which DuPont contracted to perform such "maintenance work." He also stated that DuPont used its own employees and had its own equipment to grind and level concrete pads in preparation for installing machinery.

When deposed, Tempel testified that DuPont's Contracted Services and Construction Division decided when to hire outside contractors. Although he knew individuals who were involved in the process, he had no day-to-day interaction with them before 1983. Asked to affirm that he was not the individual from DuPont most knowledgeable regarding work by outside contractors in the late 1970's and early 1980's, Tempel responded that he was "familiar with the procedures and the process in place for using contractors."

The plaintiffs attacked Tempel's testimony, asserting that he was not personally familiar with Rapid or responsible for hiring outside contractors from 1975 to 1982. But such facts, alone, were inadequate to show that he was incompetent to testify about the matters he addressed. His testimony provided substantial evidence that construction projects of the sort on which Rehm worked were regular or recurrent and work of a kind that both DuPont's own Construction Division employees and outside contractors performed. The plaintiffs offered no contradictory evidence. Thus, DuPont was Rehm's statutory employer and entitled to judgment as a matter of law.

### 7. Ford Motor Company

Ford Motor Company designed, manufactured, and sold motor vehicles during the period from 1975 to 1982. Rehm worked at two Ford plants in Louisville while employed by Rapid, the Louisville Assembly Plant (LAP) and the Kentucky Truck Plant (KTP). He testified that he helped to demolish an old assembly line and install a new one at LAP, to repair or replace metal sheeting on furnaces that were used to bake paint onto newly produced automobiles at LAP, and to install a new conveyor system at KTP. He also spent approximately six months as part of a crew of about 50 Rapid employees, working on a project in which the assembly line for the Ford LTD automobile was demolished and converted into a line for the Ford Ranger pickup truck. He worked for approximately twelve to eighteen hours per day, seven days per week, until the job was finished. Other contractors also participated in the project.

Rapid's records reflect that Ford paid $750,000.00, $125,000.00, and $254,536.00 for conveyor changeovers completed in 1975, 1980, and 1981. It paid $450,000.00 and $1,759,856.00 for conveyor demolitions completed in 1982.

Ford submitted affidavits from Bruce Hepke, Ford's manager of plant facilities, and William McKinney, a Ford engineer. They indicated that assembly lines, ovens, steel components, and extensive conveyor systems were necessary and essential to the manufacture and production of motor vehicles and that the dismantling of old assembly lines and conveyor systems and the installation of new ones was done on a regular or recurrent basis. Although the repairs, modifications, and updates varied, some components were repaired, modified, or updated annually. Moreover, the demolition and installation of new assembly lines and conveyors had been performed at Ford's numerous manufacturing facilities on a regular basis for decades.

In rebuttal, Rehm produced the affidavit of Thomas J. Feaheny, who worked for Ford from 1957 to 1983, the last six years of which as vice-president of car engineering. Feaheny testified that the reconfiguration of a plant that formerly produced

LTD automobiles into one that produced Ranger pickup trucks was known as the Yuma Program and was a major, strategic, business-altering program for Ford.

Although Ford's evidence showed that demolishing, repairing, modifying and updating assembly lines, conveyor systems, and their components were regular or recurrent at Ford, no evidence showed that the work was of a kind that Ford or similar businesses would normally expect or be expected to perform with employees. Therefore, Ford was not entitled to judgment as a matter of law and the claim must be remanded to the trial court for further proceedings.

### 8. General Electric Company

General Electric Company (G.E.) manufactured household appliances at its Appliance Park facility during the relevant period. Rehm stated that he worked at the facility approximately 40–50 times during the seven years that he was employed by Rapid. He worked for approximately nine months to a year on a "tear out" in Building 5. The project included demolishing an old conveyor system and the associated furnaces, pipes, and "anything that was in this one area of the building" and then installing a new assembly line and rack system. He described using cutting torches and sledgehammers to demolish a 10′ × 20′ × 200′ furnace that baked paint onto refrigerators. Another project was to dismantle conveyors and piping in the upper part of the building and lower them to the floor for removal. Rehm also worked about one month in each of the other five buildings, tearing out and re-routing or installing new conveyor systems and their supporting piping.

Kenneth Sheets stated that Rapid commonly performed minor burn downs because G.E. continuously removed, replaced, and re-arranged conveyors as product designs changed. He described the project at Building 5 as being a major burn down and re-tooling that involved removing conveyors, a large oven, and supporting structural steel as well as two pickling machines and part of the paint system. He characterized the project as "a major renovation of the plant" and "not a common thing to do."

Rapid's business records indicated that it completed several projects for G.E. in 1982 and received $108,500.00 for an overhead conveyor, $212,000.00 and $108,500.00 for racks, $227,000.00 for dryer repair, $153,500.00 for miscellaneous overhead conveyors, and $2,332,600.00 for conveyor installation.

Michael Phillips, who had worked at Appliance Park since earning a degree in industrial technology in 1969, provided an affidavit and was deposed. After a year in a supervisory position, Phillips held various managerial positions. He was unit manager of major fabrication for Building 3 from about 1975 to 1979 and a contracting agent in Capital Equipment from 1979 to 1986, which involved purchasing production equipment used at Appliance Park and four other G.E. plants. Phillips admitted that replacing conveyor systems and production equipment are major renovations but testified that both had to be modified, renovated or replaced frequently due to product changes, age and wear, and productivity enhancement. Tear-outs occurred "every year as a course of our business," and "every summer shutdown, every Christmas shutdown, tear-out and rearrangement [was] automatic." Phillips stated that Rapid and two other companies were constantly on-site doing conveyor work and had demolished and installed conveyor systems in all six buildings at Appliance Park.

Business records indicated that G.E. paid Rapid over $30,000,000.00 for 3,840

jobs from 1970 to 1985. Based on the volume of Rapid's work, the trial court determined that it was a regular or recurrent part of G.E.'s business. We disagree.

Although evidence that a contractor performs a high volume of work for a business for a number of years shows that the contractor works regularly or recurrently for that business, it does not show that every kind of work that the contractor performed was regular or recurrent. Nor does it show that the business or similar businesses would normally use or be expected to use employees for every kind of work that the contractor performed. Phillips' testimony provided substantial evidence that the modification, renovation or replacement of conveyor systems and production equipment was regular or recurrent work at Appliance Park. In the absence of any contrary evidence, a business that required three contractors to be on-site, constantly performing conveyor modifications and renovations, would normally expect or be expected to perform such work with employees. However, nothing indicated that a major burn-down and installation of the magnitude that Rehm and Sheets described in Building 5 was regular or recurrent or that it was work of a kind that G.E. or a similar business would normally perform or expect to perform with employees. That portion of the claim must be remanded to the trial court for further proceedings.

### 9. Goodrich Corporation

From 1975–1982 Goodrich Corporation f/k/a/ B.F. Goodrich Company manufactured vinyl resins and compounds, vinyl latex, various rubbers, chlorinated polyvinyl chloride, and various other substances. Rehm worked at Goodrich's plant for about two to three months, removing and replacing machinery, pumps, motors, and pipes.[3] He worked with pumps that were up to five feet long and steel pipe that was up to six inches in diameter, and he recalled hauling out a two foot by three foot motor. Large groups of contract electricians, insulators, pipefitters, millwrights and ironworkers worked at the site. He met no Goodrich employees.

Goodrich filed affidavits from William Simpson, an engineer at the facility during the period from 1975 to 1982, and Ronald Kaminski, who held managerial positions at that time, including manager of capital planning and plant manager. Kaminsky's affidavit stated:

> Goodrich personnel performed some mechanical repairs on the piping and machinery at the Louisville plant. For tasks that required more than one person and more than a couple of hours to complete, Goodrich frequently contracted with outside contractors. These tasks included replacing existing production line equipment with new pumps and motors and repairing/replacing equipment where the parts to be serviced were physically large.

When deposed, Simpson stated that both Goodrich employees and outside contractors removed pumps. Kaminsky stated that the plant had its own staff of unionized pipefitters, millwrights, and plumbers, who performed day-to-day maintenance at the plant. He also testified that Goodrich's approach to repairs of piping and machinery was to have in-house employees handle the normal workload and hire contract workers to perform emergency or major repairs. He explained, "[W]e were very sensitive to costs and head count.

---

**3.** Co-workers testified to doing conveyor repairs with Rehm at Goodrich, but he made no such allegation. Given this conflict, evidence that Goodrich employees also did conveyor repairs did not entitle it to summary judgment.

And what we would do is staff for normal work load." Asked specifically about repairs that had to be capitalized and major breakdowns, he stated, "We would try to use our people first.... The preferred route would always be to use our own people to keep them employed. We'd use outside help to shave peak loads and allow our overall cost position to be lower." Kaminsky also stated that Goodrich used outside contractors when very heavy rigging was required to remove pieces of equipment and that outside contractors were almost always present somewhere in the plant, in part doing work on capital projects.

Kaminsky's testimony indicated that outside contractors were always working on capital projects at Goodrich, providing substantial evidence that such projects were regular or recurrent. Although it showed that Goodrich employees worked on some capital projects and some major repairs, it failed to show that a project such as Rehm described was work of a kind that the company would normally expect or be expected to perform with employees rather than outside contractors. Thus, the claim must be remanded to the trial court for further proceedings.

### 10. International Truck and Engine Corporation

International Truck and Engine Corporation f/k/a International Harvester Company and Navistar International Transportation Company produced diesel engines, medium and heavy trucks, school buses, service vehicles, and vehicle parts and service.

Rehm testified that he performed "maybe 50 different jobs" at International during a five-year period, including both routine repairs and updating equipment. One project was to "burn down" and remove the entire foundry assembly and install new conveyor systems, furnaces, machinery, and other equipment. The project took about a year and involved workers from all types of crafts.

Rapid's records indicated that it completed a Wheelabrater in 1979 for which International paid $137,486.00 and that it relocated equipment in 1980 for which International paid $650,000.00. When deposed, Don Boaz testified that Rapid performed "a multitude" of work at International, was there on a daily basis from 1975 to 1982, and performed 90% of the work in the foundry. Rapid also performed a burn down. Ken Sheets testified that Rapid was in and out of the International plant for years and performed a re-tooling on the foundry in the early 1980's. Although the plant was torn out fairly often, the foundry re-tooling was the first that he had seen.

An affidavit from James Schuman, who held management positions at International from 1960 until 1992, stated that the company employed its own millwrights and other tradesmen to perform furnace repairs and to repair and update production equipment. Outside millwrights were brought in "for larger jobs or when [International's] tradesmen were committed to other projects." Relining and repairing furnaces, updating equipment, and repairing machinery were regular and recurrent, particularly at facilities with foundry operations.

Joseph Mavri, a floor manager at International when Rehm worked there, testified that almost any project given to an outside contractor would also be performed by International employees. Employees performed capital projects, and the union had to approve the use of outside contractors. The size of a project was often what determined whether the company would use outside contractors rather than the type of work that it involved.

Mavri testified that the maintenance department would perform demolition and install major equipment when the company had enough workers. Asked whether specialized skills were a factor, he replied, "Nope ... because [the workers] all came from the same union hall, so when we used millwrights, they all came from the same union hall as the contractors' [millwrights]." Mavri testified that International did not have certain specialized equipment such a mobile cranes; therefore, outside contractors always performed that work. Dave Schwartz, who worked at the plant from 1947–1981, testified that furnace linings wore out periodically and that relining them was a normal activity.

There was substantial evidence that work repairing, tearing out, and installing equipment was regular or recurrent and work of a kind that International employees would perform. Because Rehm presented no evidence to the contrary, International was entitled to judgment as a matter of law regarding most of the work that he performed. However, the year-long foundry demolition and retooling project is another matter. Testimony from Messrs. Mavri and Schwartz established that International employees performed the same types of work as Rehm; that they worked on "capital projects;" and that relining furnaces was performed periodically. But neither discussed the foundry demolition and retooling project, and nothing indicated that the sorts of "capital projects" performed by International employees included projects of that magnitude. Therefore, although International was entitled to judgment as a matter of law regarding Rehm's other work, it was not entitled to judgment regarding the demolition and retooling project. That portion of the claim must be remanded to the trial court for further proceedings.

### 11. Kentucky Utilities Company

■ Kentucky Utilities Company (KU) generated and sold electricity and also sold natural gas. Rehm testified that he worked at KU for approximately one month, repairing or removing and replacing motors, furnaces, and piping. Rehm asserted that the work was not regular or routine maintenance but admitted that he had no personal knowledge of KU's maintenance practices.

In an affidavit KU's maintenance manager, Larry E. Byrd, stated that the periodic repair or replacement of power-generating equipment was vital to KU's business, an ordinary part of plant maintenance, and performed customarily, regularly, and repeatedly. KU's electrical and mechanical maintenance employees and the station's crew of full-time millwrights typically performed such work, but sometimes it was contracted to companies such as Rapid.

KU submitted substantial evidence that the repair, removal, and replacement of power-generating equipment were regular or recurrent activities that KU typically performed with employees. Absent any evidence that the project on which Rehm worked differed significantly from those that its employees performed, KU was entitled to judgment as a matter of law.

### 12. Lorillard, Inc.

Lorillard manufactured tobacco products. Rehm testified that he worked on a project at Lorillard for approximately one month as part of a crew of six to eight. They demolished, removed, replaced, and installed an assembly line, several hundred feet of pipes, and some large machines (10′ × 10′ × 5′) in a section of the plant that was closed down. Electricians and pipe insulators were also working at the site. No Lorillard employees supervised.

Sherwood G. McNiel began working for Lorillard in 1975 as an engineer and was a production engineer from 1979 from 1986. His affidavit stated that the machinery, assembly lines, and conveyor systems at Lorillard's plant were necessary for production and that their repair, maintenance, and replacement were a regular and recurrent part of its business. When deposed, he testified that Lorillard updated equipment continuously and had a "full shop" with 90 full-time maintenance employees, including 15–20 millwrights. It purchased or manufactured conveyors then had employees install them. McNiel testified that he was unfamiliar with Rapid and was asked, then, if it was fair to say that he could not testify that any of Rapid's work was regular and recurrent at Lorillard. He replied, "Well it wouldn't have been recurrent because we didn't outside contract for millwright services. We had our own millwrights." Asked whether it was fair to say that Rapid's work would not have been regular and recurrent, he stated, "They wouldn't have been working there." Asked again, he replied, "That's right; it couldn't have been regular and recurrent, no."

Although the Rehms complain that the trial court failed to interpret McNiel's testimony as being an admission that Rapid did not perform work that was regular and recurrent for Lorillard, his testimony as a whole does not support their view. McNiel's testimony provided substantial evidence that the repair, maintenance, and replacement of equipment were regular or recurrent activities at Lorillard; that the company had a "full shop," substantial maintenance staff, and 15–20 millwrights; that employees manufactured conveyors; and that employees installed conveyors, including those that were purchased. However, Lorillard did not provide substantial evidence that it or a similar business would normally use employees to perform the type of demolition and installation project that Rehm described. Therefore, the claim must be remanded for further proceedings.

### 13. Louisville Gas and Electric Company

Louisville Gas and Electric Company (LG & E) generated electricity and sold electricity and natural gas. Rehm testified that he worked for a total of three months, on three separate projects at two LG & E facilities. He removed, replaced, and installed motors, equipment, and pipes that were connected to six to eight coal-burning furnaces.

Charles R. Jacobs and Joseph M. Didelot, supervisors at the two facilities, provided affidavits stating that the periodic repair and replacement of motors and other equipment were a regular and recurrent part of LG & E's business and that its employees performed the work although it was occasionally contracted to companies such as Rapid. Jacobs characterized such repairs and replacements as being "an ordinary part of plant maintenance" that LG & E "customarily, regularly and repeatedly" performed with its own employees at the time Rehm worked at the plant. LG & E also presented documentary evidence regarding the repair/replacement of motors, pumps, blowers, and other equipment that its employees performed.

An affidavit from Joseph Federle, an LG & E maintenance electrician from 1976 to 1984, stated that the company "customarily and repeatedly" repaired and replaced motors, related pumps, and machinery when they failed or operated improperly. He introduced maintenance logs illustrating the types of repairs and replacements that employees performed from 1975 to 1982.

Substantial evidence indicated that the repair and replacement of motors and other equipment were regular or recurrent activities that LG & E employees performed. Rehm asserted that his work was not regular or routine maintenance but admitted that he had no personal knowledge of LG & E's maintenance practices. Because Rehm presented no evidence that the project on which he worked was significantly different from those that LG & E employees performed, LG & E was entitled to judgment as a matter of law.

### 14. Philip Morris, Inc.

■■■ Philip Morris manufactured cigarettes. Rehm's affidavit stated that he worked at the Philip Morris plant on one occasion for about a year, installing the stemmery conveyor and rack systems. He testified subsequently that he spent about six months tearing out old equipment and installing new, including a lot of insulated piping. The six months' work occurred on and off over a period of time and involved about 15 different jobs. He stated that he repaired the drying furnace in the stemmery and worked seven to ten days on the conveyor system that ran into the dryers. Rapid's records indicate that it completed $449,900.00 and $208,400.00 conveyor modifications in 1981 and 1982, respectively, and completed $634,000.00 and $168,000.00 projects involving the "hogshead" conveyor system in 1982.

Don Boaz stated that Rapid worked at Philip Morris "continually for several years." The largest single job was a year-long project that involved the hogshead conveyor and other conveyor modifications as well as several tobacco storage silos, lifts, and tobacco cutters. Philip Morris personnel supervised the work, which was a "goodly sized project" and involved up to 100 Rapid employees at a time.

An affidavit from Terry W. Bowman stated that Rapid's work at Philip Morris was a regular or recurrent part of its operation and done repeatedly over the years. He testified subsequently that Phillip Morris employed a maintenance staff of 400 craftsmen from eight different unions in the late 1970's and early 1980's. They installed machinery and equipment and performed daily maintenance. Bowman acknowledged that the expansion or replacement of a conveyor system was a capital expenditure. He also acknowledged that replacing dryers and conveyor systems was performed as needed rather than on a regular basis, but he also stated that it was done repeatedly over the years. Bowman testified that company employees not only were capable of repairing, replacing, and installing conveyor systems and of maintaining and repairing stemmery dryers, they often did so. Occasionally, they replaced an entire conveyor or dryer. Bowman explained, "If our men felt like they could perform the work on a cost breakeven basis, they would try to do it in-house." Outside contractors were used for jobs that involved more work than employees could handle, even on an overtime basis, or for jobs that had to be performed in a tight timeframe.

Substantial evidence indicated that Phillip Morris repaired and replaced dryers and conveyor systems repeatedly over the years; that employees normally performed the work; but that outside contractors sometimes supplemented its staff. Rehm offered no evidence that Phillip Morris employees did not perform projects of the sort on which he worked. Therefore, Phillip Morris was entitled to judgment as a matter of law.

### 15. Reynolds Metals Company

Reynolds Metals manufactured aluminum foil and other consumer packaging

products. Rehm's affidavit and deposition indicated that he worked at Reynolds on one occasion for approximately six weeks, removing, replacing, and installing machinery, piping and equipment. The machines were dismantled into smaller pieces and hoisted out with a crane. Other tradesmen from other contractors were involved in the project. Rehm stated that he also performed intermittent work replacing machines and repairing cranes.

An affidavit from William Darden stated that Reynolds's manufacturing process was highly mechanized. It consisted of numerous conveyors, machines, and other equipment, and their installation, removal, and maintenance were regular and necessary parts of Reynolds's operations. He testified that Reynolds "has employed—and continues to employ millwrights, mechanics, and/or machinists, whose job responsibilities include the repair and maintenance of the plant's machinery and equipment" but that it hired outside contractors occasionally "to install and repair certain machinery and equipment."

Although there was substantial evidence that it was normal for Reynolds employees to repair and maintain the plant's machinery and equipment, there was no substantial evidence that they would perform a six-week project to remove, replace, and install machinery, piping, and other equipment or repair cranes. Therefore, the claim must be remanded to the trial court for further proceedings.

### 16. Rohm and Haas Company

■ Rohm and Haas manufactured chemicals and used pumps, blowers, and motor-or turbine-driven devices in its manufacturing process. Rehm worked at Rohm and Haas a couple of weeks at a time for a total of about six months, removing and replacing pipes, machines, motors, and pumps, aligning the motors to

the pumps, and "setting it all up for the manufacturing process." He stated that a Rohm and Haas engineer would advise Rapid's project coordinator what needed to be done.

Don Boaz testified that Rapid had a time and materials contract with Rohm and Haas, worked at the plant "quite frequently," and "would normally keep a crew of men there all the time." He stated that the same types of jobs were performed repeatedly. They could take anywhere from one hour to one month.

Dennis E. McCormick was a 30–year Rohm and Haas employee who had served as a maintenance engineer, maintenance manager, maintenance utility manager, and maintenance superintendent. His affidavit stated that the company employed a full-time maintenance crew, whose duties included "removal and installation of manufacturing equipment, including piping, pumps, blowers, motors, and any motor or turbine driven appliances"; that the crew "would perform these functions on a daily basis"; that "Rohm and Haas would periodically subcontract work, including millwright and ironwork to either supplement the full-time maintenance crew's functions, or participate in engineering projects to increase the plant's manufacturing capacity or correct manufacturing problems"; and that "Rohm and Haas periodically subcontracted with Rapid Installation to perform necessary millwright work, including installation and removal of pumps, blowers, motors and motor or turbine-driven appliances."

McCormick's testimony provided substantial evidence that removing and replacing pipes, machines, motors, and pumps were regular or recurrent and work that Rohm and Haas normally performed with employees. Because Rehm offered no evidence that the kinds of two-week projects on which he worked were significantly dif-

ferent from those that Rohm and Haas employees performed, Rohm and Haas was entitled to judgment as a matter of law.

## IV. FAILURE TO SECURE COVERAGE

■ The plaintiffs also argue that the "up-the-ladder" defense was barred by the premises owners' alleged failure to secure payment of compensation, which KRS 342.690(1) requires as a precondition to the applicability of the exclusive remedy provision. The trial courts in both cases ruled that the owners had presented uncontroverted evidence that they had secured payment of workers' compensation benefits, either through the purchase of an insurance policy or through self-insurance.

In the G.E. case, the Court of Appeals reversed the trial court, holding that there was a question of fact as to whether GE had obtained sufficient coverage even though GE proved that it had complied with KRS 342.340(1) by producing a certification from the Department of Workers' Claims that GE had workers' compensation insurance during the relevant time period.

In the Rehm case, the Court of Appeals affirmed the trial court, holding that because the evidence of coverage, in the form of affidavits from insurers and/or certifications from the Department of Workers' Claims, was uncontroverted, summary judgment on this issue was appropriate. Essentially, the court held that the certificates of coverage or affidavits provided by the companies were sufficient to resolve the issue as a matter of law.

A certification of coverage from the Department of Workers' Claims or an uncontroverted affidavit from the employer's insurer is prima facie proof that a company has secured payment of compensation for the purposes of KRS 342.690(1). Absent

evidence that the coverage was in some way deficient as to a worker, such a showing is enough to invoke the exclusive remedy provision of KRS 342.690(1), if applicable. In this respect, we reverse the Court of Appeals in the G.E. case but affirm the Court of Appeals in the Rehm case.

## V. CONSTITUTIONALITY

■ Finally, we also address the claim raised by the Rehms that the application of KRS 342.610(2)(b) and KRS 342.690(1) so as to create "up-the-ladder" or "exclusive remedy" immunity in a premises liability matter violates the jural rights doctrine flowing from Sections 14, 54, and 241 of the Kentucky Constitution. We simply note that its applicability to the Workers' Compensation Act, as the Rehms urge, has been resolved against them by earlier cases. The portion of Judge Paisley's opinion of the Court of Appeals on this issue thoroughly explored the question and relevant precedent, and correctly decided the issue. As such, we adopt Judge Paisley's opinion on this issue as our own:

Together these constitutional provisions form this jurisdiction's constitutional "jural rights" doctrine, which precludes any legislation that impairs a right of action in negligence that was recognized at common law prior to the adoption of the Commonwealth's 1891 Constitution. *See McDowell v. Jackson Energy RECC*, 84 S.W.3d 71, 73 (Ky. 2002).

Kentucky Constitution § 14 provides that:

All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

Section 54, a constitutional counterpart to Section 14, prohibits the legislature from abolishing jural rights established prior to the enactment of our constitution. *Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347, 350 (1932). Specifically, the section provides as follows:

The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property.

Section 241 provides as follows:

Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

The Kentucky Workers' Compensation Act is a legislative remedy which affords an injured worker a remedy without proof of the common law elements of fault. It is, however, exclusive of the remedies available under common law. KRS 342.690. The earliest version of the Act was compulsory, giving the employee no right to reject or accept coverage under the Act, and it failed to pass constitutional scrutiny. *Ky. State Journal Co. v. Workmen's Compensation Board*, 161 Ky. 562, 170 S.W. 437 (1914). The right to accept or reject the Act, now embodied in KRS 342.395, was added and the Act was later upheld:

It is quite correct to say that this section operates as a restraint on the General Assembly and prohibits it from attempting to limit the amount of recovery in the cases described in the section. But in this legislation the General Assembly did not arbitrarily or at all undertake to limit the amount of recovery. It merely proposed a statute to a certain class of people for their individual acceptance or rejection. It did not assume to deprive these classes or individuals without their consent of any constitutional rights to which they were entitled. The General Assembly merely afforded by this legislation a means by and through which individuals composing classes might legally consent to limit the amount to which the individual would be entitled if injured or killed in the course of his employment.

*Greene v. Caldwell*, 170 Ky. 571, 580–81, 186 S.W. 648 (1916).

*Greene v. Caldwell* held in effect that if the employer and employee voluntarily agreed to operate or work under the Act, they would be bound by its provisions. *Whitney v. Newbold*, 270 Ky. 209, 109 S.W.2d 406, 408 (1937).

In 1952, the legislature amended the provisions of the Workers' Compensation Act relating to acceptance of the Compensation Act by employees. Prior to 1952 the Act had provided that an employee must indicate his elections to accept the Act by signing a written notice of acceptance. The 1952 amendment provides, in substance, that an employee is deemed to have accepted the Act unless and until he files with his employer a written notice of rejection. *Wells v. Jefferson County*, 255 S.W.2d 462 (Ky.1953).

There is no allegation by the appellants that James [Rehm] ever filed a written notice of rejection of coverage under the Act, and thus he is deemed to

have consented to coverage under the Act. James's consent to the provisions of the Act, including its remedies and limitations, negates any argument that the application of KRS 342.610 and KRS 342.690 in this case is unconstitutional under the jural rights doctrine. The legislature's decision to provide up-the-ladder immunity to contractors who hire subcontractors to perform functions which are a regular and recurrent part of the contractors' business is a provision which James accepted when he elected coverage under the Act.

## VI. CONCLUSION

We affirm the Court of Appeals in the G.E. case, 2004–SC–000043–DG, insofar as G.E. was not entitled to judgment as a matter of law, but reverse the Court of Appeals as to the issue concerning proof of workers' compensation coverage. We reverse the Court of Appeals in the Rehm case, 2005–SC–000242–DGE, to the extent that American Standard, Ford, G.E., Goodrich, International, Lorillard, and Reynolds were not entitled to judgment as a matter of law but affirm it regarding the other premises owners. We also affirm the Court of Appeals on the proof of workers' compensation coverage and the constitutionality of "exclusive remedy" immunity under the "jural rights" doctrine. The G.E. case and the Rehms' cases against American Standard, Ford, G.E., Goodrich, International, Lorillard, and Reynolds are therefore remanded to the Jefferson Circuit Court for further proceedings that are consistent with this opinion.

All sitting. LAMBERT, C.J., and CUNNINGHAM, MINTON, NOBLE, SCHRODER and SCOTT, JJ., concur.