RENDERED: FEBRUARY 19, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0169-DG

MINOVA USA, INC.                                                          APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2022-CA-1534
SCOTT CIRCUIT COURT NO. 18-CI-00772

TOM JOLLY                                                                  APPELLEE

**OPINION OF THE COURT BY JUSTICE NICKELL**

**REVERSING AND REMANDING**

We granted discretionary review to determine whether a manufacturer who contracts for the delivery and transportation of raw materials qualifies as a "contractor" entitled to "up-the-ladder" immunity from tort liability under the exclusive liability provisions of KRS[1] 342.610(2)(b) and KRS 342.690 for an injured worker's work-related claims.  The Scott Circuit Court granted summary judgment in favor of the manufacturer, holding it qualified for "up-the-ladder" immunity.  The Court of Appeals reversed the trial court and remanded for additional proceedings on the merits of the injured worker's tort claims.  Having carefully considered the record, briefs, arguments, and law, we

---

[1] Kentucky Revised Statutes.

reverse the decision of the Court of Appeals and remand for reinstatement of the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Minova USA, Inc., manufactures resin capsules and other products for use in the mining, construction, and energy industries at a plant located in Georgetown, Kentucky. The resin capsules are primarily composed of resin mastic and catalyst paste. Resin mastic and catalyst paste are, in turn, composed of ground limestone filler.

At all times relevant to the present appeal, Minova sourced its limestone filler from Lhoist North America of Tennessee. To transport the limestone from Lhoist's facility in Crab Orchard, Tennessee, to its plant in Georgetown, Kentucky, Minova entered into a transportation services agreement with Trimac on January 1, 2015.[2] Though indicating the agreement expired on December 31, 2017, the contract's terms provided for automatic annual renewals thereafter.[3]

In 2017, Trimac picked up, hauled, and delivered 389 loads of limestone filler to Minova. Consistent with this rate of delivery, Trimac delivered 38 truckloads in January 2018 and 36 truckloads in February 2018. Tom Jolly

---

[2] At the time the agreement was entered, Minova was known as Orica Ground Support, Inc.

[3] At oral argument, Jolly questioned whether the agreement was effective at the time of his injury in 2018. The present record does not contain any indication that the agreement was terminated. Thus, it appears the contract was in effect at all relevant times to this appeal.

was employed as a delivery truck driver by Trimac at all times pertinent to this appeal and personally delivered "multiple loads of raw limestone" to Minova.

On February 26, 2018, Jolly made a delivery to Minova's plant. While Jolly was preparing to unload the truck, an unsecured 700-pound metal cart rolled down a ramp and struck him, causing severe injuries. The cart had been under the control of Pierre M. Vinzu Nseke, an employee of Management Registry, Inc., d/b/a Malone Staffing Solutions.

Jolly sought and received workers' compensation benefits from his immediate employer, Trimac. He also filed tort claims against Minova, Malone Staffing, and Nseke, alleging various theories of negligence. After conducting discovery, Minova, Malone, and Nseke each filed motions for summary judgment arguing they were entitled to judgment as matter of law based on the exclusive liability provisions of KRS 342.610(2)(b) and KRS 342.690. On July 12, 2022, the trial court entered an order granting summary judgment in favor of Minova.[4] In a separate order entered on July 15, 2022, the trial court granted summary judgment in favor of Malone Staffing and Nseke.

Subsequently, Jolly filed a motion to alter, amend, or vacate the summary judgments pursuant to CR 59.05. In an order entered on November 30, 2022, the trial court denied the motion as to Minova, concluding that it qualified as a contractor under KRS 342.610(2)(b). However, the trial court granted the motion and vacated the judgments in favor of Malone Staffing and

---

[4] The trial court designated this order as final and appealable with no just cause for delay. Kentucky Rules of Civil Procedure (CR) 54.02.

Nseke upon a determination that they had failed to sufficiently plead an exclusive liability defense under KRS Chapter 342. Jolly's claims against Malone Staffing and Nseke remain pending.

On direct appeal, the Court of Appeals reversed the trial court's order granting summary judgment to Minova, concluding that Minova did not qualify for up-the-ladder immunity. We granted discretionary review and heard oral argument.

## LAW AND ANALYSIS

### A. Exclusive Liability Defense Was Not Waived.

Before examining the merits of the present appeal, we must first address Jolly's argument that Minova waived the protection of the exclusive liability provisions contained in KRS 342.610 and KRS 342.690. Minova's answer to Jolly's first amended complaint stated as follows:

> The plaintiff's action is barred, in whole or in part, by the exclusive-remedy provisions of the Kentucky Workers' Compensation Act, including provisions in KRS 342.690 and KRS 342.610.

Even so, Jolly contends Minova failed to support its pleading with sufficient factual averments as to the nature of its defense and compliance with the applicable statutes. Additionally, Jolly argues Minova should otherwise be barred from asserting an exclusive liability defense under the doctrines of estoppel and laches because Minova improperly concealed and unfairly delayed the presentation of this defense. We disagree.

The exclusive liability provision under KRS 342.610 is an affirmative defense which is subject to waiver if insufficiently pled. *Gordon v. NKC*

*Hospitals, Inc.*, 887 S.W.2d 360, 363 (Ky. 1994). CR 8.03 governs the pleading of affirmative defenses and requires a defendant to

> set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

Kentucky law adheres to the notice pleading standard. *Russell v. Johnson & Johnson, Inc.*, 610 S.W.3d 233, 240 (Ky. 2020). We have interpreted the Civil Rules to merely require a party to provide fair notice and identify the claim or defense. *Id.* Moreover, "[p]roper pleadings need not detail the evidentiary facts upon which a claim or a defense is based." David V. Kramer, 6 *Ky. Prac. R. Civ. Proc. Ann.* Rule 12.05 n.2 (2025). "The liberal discovery practice allowed by [the Civil] Rules will enable the parties to seek evidence from sources other than the opponent's pleading." *Id.*

Jolly cites *Seiller Waterman, LLC v. RLB Props.*, 610 S.W.3d 188, 195 (Ky. 2020), and *Eaker v. Kansas Power & Light Co.*, 473 S.W.3d 153, 159 (Mo. Ct. App. 2015), for the proposition that a claim or defense must be supported by sufficient factual averments. However, both decisions are distinguishable from the present appeal.

In *Seiller Waterman*, we considered the sufficiency of a claim for wrongful use of civil proceedings ("WUCP"), a tort which is disfavored under Kentucky law and subject to strict compliance. 610 S.W.3d at 196. The plaintiff alleged the defendant had previously filed suit against it for the improper purpose of

5

"extort[ing]" money through the collection of attorney fees. *Id.* Because "an attorney seeking to collect an attorney fee in the usual course of representing a client" does not constitute an improper purpose as a matter of law, we held "[o]ther factual allegations beyond the customary aspects of client representation, i.e., performing legal services for a fee, are necessary to support the improper purpose element" of a WUCP claim. *Id.* at 198-99. In other words, the mere assertion of a legal conclusion in a complaint, without a factual basis, does not constitute a showing of entitlement to relief under CR 8.01. *Id.*

By contrast, the present appeal involves an affirmative defense under CR 8.03 as opposed to a claim for relief under CR 8.01. Notably, CR 8.01(1) requires a claim for relief to be supported by "a short and plain statement of the claim *showing* that the pleader is *entitled to relief*" while CR 8.03 merely requires a defendant "to set forth affirmatively" any affirmative defenses. (Emphasis added).

Although "[i]n general the requirements and conditions for pleading in a complaint should be observed in pleading affirmative defenses[,]" Leslie W. Abramson, 11 *Ky. Prac. Civ. Proc. Forms* § 33:1 (2025), valid reasons exist to treat the pleading of an affirmative defense differently from the pleading of a claim for relief. *Odyssey Imaging, LLC v. Cardiology Associates of Johnston, LLC*, 752 F. Supp. 2d 721, 726 (W.D. Va. 2010). In the context of such pleadings, a plaintiff and a defendant are not similarly situated because

6

[k]nowledge at the pleading stage is often asymmetrical, disproportionately favoring the pleading of a claim by a plaintiff who has had the opportunity to time its filing. While the plaintiff often can conduct an investigation before filing the complaint to ensure its allegations are adequately supported, the defendant must respond quickly after being served.

*Id.*

Additionally, "if a new claim becomes evident during discovery, plaintiffs may usually take advantage of liberal rules governing amendment of pleadings and amend the complaint to add the claim, but some affirmative defenses could be waived even if the defendants did not have evidence to support the defenses until the discovery process." Kramer, 6 *Ky. Prac. R. Civ. Proc. Ann.* Rule 8.03 at n.3. "Thus, defendants routinely plead a multitude of affirmative defenses out of an abundance of caution in the event that a basis for the defense appears during discovery." *Id.* Based on the foregoing authority and factual distinctions, we do not perceive *Seiller Waterman* to control the outcome of the present appeal.

The decision of the Missouri Court of Appeals in *Eaker* is also distinguishable from the present appeal because Missouri law differs from Kentucky law relative to the pleading of affirmative defenses. On the surface, it certainly appears that *Eaker* could support a determination that Minova insufficiently pled its exclusive liability defense, if that decision was binding on this Court. However, the pertinent Missouri Rule contains a requirement that a responsive pleading "shall contain a short and plain statement of the facts showing that the pleader is entitled to the defense or avoidance." *Eaker*, 473

7

S.W.3d at 157 (quoting Missouri Supreme Court Rule 55.08). The Kentucky Rule on affirmative defenses, set forth in CR 8.03, contains no such requirement. Therefore, we decline to apply the reasoning of *Eaker* here.

In the present appeal, we conclude Minova's initial pleading in answer to Jolly's first amended complaint was sufficient under CR 8.03 because it provided fair notice and identified the nature of its exclusive liability defense. Further, by providing adequate notice and identification of its exclusive liability defense in its answer, Minova rendered groundless Jolly's assertion that the defense should be barred by estoppel and laches due to improper concealment or unfairly delayed presentation.

### B. Trial Court Properly Granted Summary Judgment

Minova argues the Court of Appeals erred by concluding it did not qualify as a "contractor" under KRS 342.610(2)(b) and KRS 342.690 based on its finding the business had failed to present sufficient evidence that the delivery and transportation of raw materials was a regular or recurrent part of its work. We agree.

Under Kentucky law, when a worker suffers a work-related injury, his or her "recovery from the employer is limited to workers' compensation benefits." *Beaver v. Oakley*, 279 S.W.3d 527, 530 (Ky. 2009). "The injured worker is not entitled to tort damages from the employer or its employees for work-related injuries." *Id.* (footnote omitted). "And, in this context, the term *employer* is construed broadly to cover not only the worker's direct employer but also a

8

contractor utilizing the worker's direct employer as a subcontractor." *Id.*

(footnotes omitted). This concept is known as "up-the-ladder" immunity. *Id.*

Specifically, KRS 342.690(1) states in pertinent part as follows:

If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. **For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.**

(Emphasis added).

In turn, KRS 342.610(2)(b) governs the liability of a contractor in pertinent part as follows:

(2) A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. Any contractor or his or her carrier who shall become liable for such compensation may recover the amount of such compensation paid and necessary expenses from the subcontractor primarily liable therefor. **A person who contracts with another**:

. . .

(b) **To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person**

shall for the purposes of this section be deemed a contractor, and such other person a subcontractor.

(Emphasis added). "The purpose of the provision of KRS 342.610 that a

contractor is liable for compensation benefits to an employee [of] a

9

subcontractor who does not secure compensation benefits is to prevent subcontracting to irresponsible people." *Fireman's Fund Ins. Co. v. Sherman & Fletcher*, 705 S.W.2d 459, 461 (Ky. 1986).

We have interpreted the word "regular," in the context of KRS 342.610(2)(b) to "mean[] that the type of work performed is a 'customary, usual or normal' part of the premises owner's 'trade, business, occupation, or profession,' including *work assumed by contract* or required by law." *General Elec. Co. v. Cain*, 236 S.W.3d 579, 586-87 (Ky. 2007) (emphasis added). The related term "'recurrent' means that the work is repeated, though not 'with the preciseness of a clock.'" *Id.* (quoting *Daniels v. Louisville Gas & Elec. Co.*, 933 S.W.2d 821, 824 (Ky. App. 1996)).

> Moreover, we have explained that reference to work
>
> that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" of an owner *does not mean work that is beneficial or incidental to the owner's business or that is necessary to enable the owner to continue in business, improve or expand its business, or remain or become more competitive in the market.* It is work that is customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees.

*Id.* at 588 (emphasis added).

In other words, the definition of regular or recurrent work cannot be reduced merely to "whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation

10

service." Arthur Larson & Lex K. Larson, 6 *Larson's Workers' Compensation Law* § 70.06[10] (2025). "Stated simply," the phrase "regular or recurrent part of the work" contained in "KRS 342.610(2)(b) refers to work that is customary, usual, normal, or performed repeatedly and that the business or a similar business would perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 589.

The test for whether a particular labor or service constitutes a regular or recurrent part of a business "is relative, not absolute" and considers all relevant factors including "its nature, size, and scope as well as whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform." *Cain*, 236 S.W.3d at 588. This fact-specific inquiry focuses on the relationship between the parties and the nature of their work arrangement "in a practical and functional—not hypertechnical—way." *Beaver*, 279 S.W.3d at 532.

Eschewing bright-line rules, this Court's approach to determining statutory employment in the context of KRS 342.610(2)(b) is consistent with the majority view. As aptly expressed by a leading treatise:

> There is no infallible test for determining if a particular act by a contractor's employee was part of a landowner's usual business; however, the facts must show that the work included some duty or activity routinely performed in the operation of the owner's usual business conducted on the premises, or which the employer would perform in the normal course of its trade or business.

1 *Modern Workers Compensation* § 105:18 (2025) (footnotes omitted). "[E]ach case presents its own peculiar difficulties and must be determined upon its

11

particular facts." *Sippel v. Custom Craft Tile, Inc.*, 480 S.W.2d 87, 90 (Mo. Ct. App. 1972).

As the facts herein are undisputed, the sole issue presented for determination by this Court is whether the work performed by Jolly was a regular and recurrent part of Minova's business. Because the issue is a question of law, the Court's review is de novo. *Cain*, 236 S.W.3d at 585.Further, in the absence of any genuine issues of material fact, the grant of summary judgment will be held proper if Minova was entitled to judgment as a matter of law. CR 56; *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 482 (Ky. 1991).

However, "[e]ven when the underlying facts are undisputed, a conclusion that a defendant is entitled to judgment as a matter of law must be supported with substantial evidence that a defendant was the injured worker's statutory employer under a correct interpretation of KRS 342.610(2)(b)." *Cain*, 236 S.W.3d at 585. "Substantial evidence that a defendant was an injured worker's statutory employer entitles the defendant to prevail as a matter of law unless the plaintiff goes forward with contrary evidence." In Kentucky, "'substantial evidence' means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable" persons. *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998).

Here, the delivery of limestone filler from Lhoist to Minova was clearly regular and recurrent. The present dispute centers on the sufficiency of the evidence to prove that, in delivering the limestone filler, Jolly performed work

12

that Minova "or a similar business would perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 589. This portion of the *Cain* test addresses the overarching question under KRS 342.610(2)(b), which is "[w]hen is the subcontracted work part of the regular business of the statutory employer?" Larson, 6 *Larson's Workers' Compensation Law* § 70.06[1].

Indeed, *Cain* drew its formulation of this requirement from a "general rule of thumb" by which a court may ascertain the nature of an employment relationship and distinguish statutory employment under KRS 342.610(2)(b) from other work-related arrangements which lie beyond the scope of the statute. *Cain*, 236 S.W.3d at 588. Particularly, *Cain* utilized evidence of general employment practices to distinguish capital improvements from routine maintenance:

> Employees of contractors hired to perform major or specialized demolition, construction, or renovation projects generally are not a premises owner's statutory employees unless the owner or the owners of similar businesses would normally expect or be expected to handle such projects with employees. Employees of contractors hired to perform routine repairs or maintenance that the owner or owners of similar businesses would normally be expected to handle with employees generally are viewed as being statutory employees.

*Id.* Similarly, Professor Larson regards such evidence to be a useful measure for deciding close cases, "which in the abstract look as though they might be decided either way[.]" Larson, 6 *Larson's Workers' Compensation Law* § 70.06[10].

Moreover, "[d]elivery and transportation cases turn largely on common-sense considerations of whether the delivery activity was routine or

13

extraordinary for this type of business." *Id.* at § 70.06[8]. To determine whether delivery and transportation constitutes a regular or recurrent part of the work of a business, courts and commentators have also recognized a salient distinction between contractual relationships involving the provision of substantial services and those merely incident to the purchase and sale of goods. *Id.*

The general rule is that "[t]he workers' compensation act does not apply where the transaction between the immediate employer and the person sought to be held liable as its employer is that of purchase and sale." 99 *C.J.S. Workers' Compensation* § 241 (2025). "[H]owever, when a contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a contractor within the meaning of the compensation act." *Id.*

Specific to the present appeal, *Cain* recognized that transportation and delivery services may become a regular or recurrent part of a business by contract. 236 S.W.3d at 586 (citing *Tom Ballard Co. v. Blevins*, 614 S.W.2d 247, 249 (Ky. App. 1980)). In such cases, an employer is "still a contractor if the job is one that is usually a regular or recurrent part of his trade or occupation" despite the fact that the employer "never perform[ed] that particular job with his own employees[.]" *Fireman's Fund*, 705 S.W.2d at 462. The pertinent inquiry entails consideration of all relevant factors including the nature of the services rendered under the specific contractual provisions at issue. *Blevins*, 614 S.W.2d at 249.

14

In *Blevins*, a coal mining company agreed to sell and deliver coal to the purchaser's facility. *Id.* at 248. To facilitate delivery to the purchaser, the coal company contracted with an individual, who, in turn, arranged with the owner of several trucks to "procure[] truckers to haul the coal." *Id.* Unfortunately, a truck driver was killed in an accident while returning from a delivery. *Id.*

The truck driver's estate sought workers' compensation benefits. *Id.* However, the immediate employer of the truck driver did not carry workers' compensation insurance. *Id.* The Workers' Compensation Board determined the coal company was liable for the award of workers' compensation benefits because the company qualified as the truck driver's statutory employer under KRS 342.610(2). *Id.* at 249. The Court of Appeals affirmed, explaining:

> There is strong evidence to support the conclusions that [the coal company] contracted . . . to have work done which was a regular part of its business. [The coal company] maintains that its business was mining coal and that the hauling of coal was not a regular or recurrent part of its business. Nevertheless [the coal company] paid all of the cost of hauling the coal. [The coal company] sold the coal at a price that included delivery to the facilities of the purchaser and the hauling or delivery to the customer was [the coal company's] responsibility. There was testimony that the mining business would become extinct if the mining companies could not get their product to market. We do not think it was unreasonable for the Board to conclude that the hauling of coal to the customer was a part of [the coal company's] business.

*Id.*

Notably, while *Blevins* considered the effect of the subcontracted delivery work on the part of the coal company's overall business, i.e., whether such work was necessary or essential, it did not indicate this factor was dispositive

15

or otherwise predominant among the totality of the factual circumstances. *Id.* In *Cain*, we characterized *Blevins* as a case where "the work performed by the injured worker became a part of the mining company's business by contract[.]" 236 S.W.3d at 586.

Similarly, in the present appeal, we conclude the relationship between Minova and Jolly, on behalf of Trimac, involved regular or recurrent work assumed by contract in the form of substantial services exceeding those normally incident to an agreement of purchase and sale.[5]  Specifically, Minova and Trimac entered into a transportation services agreement.  Under Section 3 of the agreement, Trimac was obligated to:

> (2) Safely load, handle and/or transport the Products from the applicable point(s) of origin to the designated delivery point(s) in accordance with all applicable Laws . . . [and]

> (3) Safely unload or make available for unloading, the Products at the designated delivery point(s) on the agreed delivery time(s) and date(s) . . . .

Relative to these duties, Trimac agreed under Section 9(c) "to comply with all [Minova] conditions and procedures when performing any Services on a[] [Minova] site[.]"  Pursuant to Section 8(b), Trimac employees were subject to "be site-trained as required by [Minova][.]"  Under Section 7 of the agreement, Minova also agreed to use Trimac as its exclusive carrier and, pursuant to

---

[5] In a typical commercial transaction relative to the sale of goods, it is the seller who must contract with a carrier to transport goods to the buyer unless the parties agree otherwise.  KRS 355.2-319(1)(a); KRS 355.2-504(a); *see also* Robert W. Keats, 4 *Ky. Prac. Methods of Prac.* §§ 3:61; 3:74 (2025).

16

Section 3(a)(6), Trimac reciprocally consented "not [to] transport any third-party goods while providing Services to [Minova][.]"

In addition, Trimac was required to "provide [Minova] a monthly performance report" under Section 3(c), and Minova and Trimac were mutually bound, pursuant to Section 6, to designate representatives for regularly scheduled "Operational Review Meeting[s]" to discuss various topics including: "matters of mutual concern and interest"; the monthly performance reports "against the Key Performance Indicators"; "[w]ays to improve the services performed" under the agreement; and "[t]he relationship of the parties."

We are convinced the level of Minova's direct involvement with the delivery and transportation process, as reflected in the provisions of its contract with Trimac, demonstrates that the transport, receipt, and unloading of raw material constitutes "part of the work" of its business and differentiates the present appeal from those decisions dealing with the transport and delivery of goods incident, ancillary, or auxiliary to an agreement of purchase and sale. KRS 342.610(2)(b); *Uninsured Emp'rs' Fund v. Ritchie*, 2012-SC-0746-WC, 2014 WL 1118201, *2 (Ky. Mar. 20, 2014) (no evidence of manufacturer's assumption of delivery and transport work by contract)[6]; *Davis v. Ford Motor Co.*, 244 F.Supp. 2d 784, 787 (W.D. Ky. 2003) (injured worker employed by seller of goods and did not perform any service for purchaser); *Kelly v. TRC Fabrication*, LLC, 487 P.3d 723, 729 (Idaho 2021) (same); *Dobransky v. EQT*

---

[6] In his brief, *Jolly* argued the reasoning of our unpublished decision in *Ritchie* should control the outcome here. We disagree for the reasons stated above.

17

*Prod. Co.*, 273 A.3d 1133, 1146-47 (Pa. Super. Ct. 2022) (insufficient evidence that drilling operator "contractually delegated that aspect of its business or trade" relative to delivery and transport of necessary materials).

Likewise, the comprehensive and detailed transportation services agreement between Minova and Trimac also distinguishes the present appeal from hypothetical situations involving the delivery and transport of goods by entities such as "Amazon, DoorDash, Uber Eats, Office Depot, Lowe's or otherwise[.]"[7]  Absent a particularized showing of unique circumstances relative to the assumption of work by contract, each of the foregoing hypothetical examples merely involves delivery and transport incident to the purchase and sale of goods.  Such incidental, ancillary, or auxiliary delivery and transport of purchased goods, without more, simply does not rise to the level of a statutory employment relationship.  *See* Larson, 6 *Larson's Workers' Compensation Law* § 70.06[8]; 99 *C.J.S. Workers' Compensation* § 241.

The purpose of immunity under KRS 342.610(2)(b) "is not to shield owners or contractors from potential tort liability but to assure that contractors and subcontractors provide workers' compensation coverage."  *Cain*, 236 S.W.3d at 587.  Moreover, our caselaw has consistently interpreted the immunity provisions of KRS 342.610(2)(b) to encompass regular or recurrent work assumed by contract.  *Cain*, 236 S.W.3d at 587.  In other words, "[a] contractor that never performs a particular job with its own employees can still

---

[7] These hypothetical examples were provided by Jolly in his brief to this Court.

come within KRS 342.610(2)(b)." *Doctor's Assocs., Inc. v. Uninsured Em'rs' Fund*, 364 S.W.3d 88, 92 (Ky. 2011) (citing *Fireman's Fund*, 705 S.W.2d at 462). Such "[c]ases must be analyzed individually . . . based on the particulars of the relationship at issue." *Id.*

Under *Cain* and the evidence demonstrating Minova's assumption of delivery and transportation work by contract, no genuine issue of material fact existed, and the trial court properly granted summary judgment in favor of Minova. Thus, the Court of Appeals erred in reversing its judgment. We need not address additional policy and economic considerations as such matters reside solely within the province of the General Assembly.

"The premise of our decision is that someone injured in this setting will receive workers' compensation no matter what—no matter whether the contractor . . . contributes to the system or not." *Black v. Dixie Consumer Prods., LLC*, 835 F.3d 579, 586 (6th Cir. 2016). "Because we treat the kind of work [Jolly] was doing as part and parcel of what [Minova] does, that means a worker injured in this setting will receive compensation regardless of fault by a company in [Minova's] shoes[.]" *Id.* "All of this also means that the immunity from a further lawsuit applies as well. This burden and this benefit lie at the heart of the trade-off built into any workers' compensation system." *Id.*

## CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Appeals and remand for reinstatement of the trial court's judgment.

19

All sitting. Lambert, C.J.; Conley, Goodwine, and Keller, JJ., concur. Thompson, J., concurs in part and dissents in part by separate opinion which Bisig, J., joins.

THOMPSON, J., CONCURRING IN PART AND DISSENTING IN PART: I agree with the majority opinion that Minova did not waive the exclusive liability provisions of the Workers' Compensation Act as a defense. Therefore, I concur with that portion of the majority's opinion.

I write separately to express my strong disagreement with its conclusion that as a matter of law Minova USA, Inc. is entitled to immunity under the Act, and dissent on the majority's resolution of that issue.

I disagree that Minova qualifies as a contractor entitled to up-the-ladder immunity in this case, thus entitling Minova to receive immunity despite paying nothing toward insuring Trimac's employees. Minova does not qualify as a contractor and hence a statutory employer entitled to immunity. Instead, it is simply a purchaser of a raw material which is a needed component of a product it produces, who contracted with a common carrier to deliver this material from the seller's mine.

The majority opinion unreasonably extends *Tom Ballard Co. v. Blevins*, 614 S.W.2d 247 (Ky. App. 1980), and expansively construes the test set out in *General Elec. Co. v. Cain,* 236 S.W.3d 579, 588 (Ky. 2007), to apply it to exclude any employee of any common carrier from ever being able to seek a tort remedy from either a buyer or seller of a material or product who contracts for its pickup, transportation, or delivery. I cannot agree with granting Minova a

20

free ride simply because the common carrier Trimac, who employed Tom Jolly as a driver, provided Jolly with workers' compensation benefits.

As explained in *Labor Ready, Inc. v. Johnston*, 289 S.W.3d 200, 204 (Ky. 2009):

> The Workers' Compensation Act is social legislation, a product of compromises by workers and employers. Workers agree to forego common law remedies in exchange for statutory benefits awarded without regard to fault. Employers agree to pay such benefits and to forego common law defenses in exchange for immunity from tort liability.

Non-employers, in contrast, are not immunized from tort claims for a worker's work injuries. *Beaver v. Oakley*, 279 S.W.3d 527, 530 (Ky. 2009). Why then, should a non-employer, Minova, who will never have to pay benefits to Jolly or other similarly situated employee drivers of Trimac that are injured at any stage in the process of picking up limestone mined from Lhoist North America of Tennessee, transporting it, and delivering it to Minova, be entitled to immunity from tort liability?

Kentucky Revised Statutes (KRS) 342.610(2) provides in relevant part:

> A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. Any contractor or his or her carrier who shall become liable for such compensation may recover the amount of such compensation paid and necessary expenses from the subcontractor primarily liable therefor. A person who contracts with another:
>> . . . .
>> (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person

21

shall for the purposes of this section be deemed a contractor, and such other person a subcontractor.

As interpreted by *Cain*:

Work of a kind that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" of an owner *does not mean work* that is beneficial or incidental to the owner's business or *that is necessary to enable the owner to continue in business*, improve or expand its business, or remain or become more competitive in the market. *It is work that is customary, usual, or normal to the particular business* (including work assumed by contract or required by law) *or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees.* The test is relative, not absolute. Factors relevant to the "work of the . . . business," include its nature, size, and scope as well as whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform.

236 S.W.3d at 588 (emphasis added, internal citation and paragraph break omitted).

The majority opinion has determined that because Trimac hauls a substantial quantity of limestone for Minova, which is essential to Minova's production of resin capsules, that Minova qualifies as a contractor under KRS 342.610(2)(b) because "the work performed by Jolly was a regular and recurrent part of Minova's business" such that Minova "or a similar business would perform or be expected to perform with employees." Such a conclusion stretches all credulity.

Instead, the hauling of the limestone was in the nature of work "that is necessary to enable the owner to continue in business" which is a category of work specifically excluded in *Cain,* 236 S.W.3d at 588, as being work of a kind

22

that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" per KRS 342.610(2)(b). I agree with the Court of Appeals' reasoning that "[w]hile theoretically, Minova could have obtained its own [federal] license [to transport bulk commodities] and hired its own fleet of drivers with commercial drivers' licenses, no evidence was presented that it or any similarly-situated business did or would have done so" and, thus, while the delivery of the limestone was "clearly a necessary function" it is simply not the same as other kind of work for which we have allowed up-the-ladder immunity. *Jolly v. Minova USA, Inc.*, 2022-CA-1534-MR, 2024 WL 1221926, at *5 (Ky. App. Mar. 22, 2024) (unpublished).

The distinction noted in *Cain*, 236 S.W.3d at 588, between capital improvements (in which immunity is not warranted) from routine maintenance (where immunity is appropriate) is not particularly helpful in determining the appropriate resolution here. In a sense, neither of those activities bears much similarity to the situation before us, in that in *Cain* the persons injured were spending their time performing extensive work on site for the company seeking immunity, whereas someone delivering raw materials spends a substantial period of time engaging in the transportation of such materials and a relatively short amount of time unloading them on site. But, to the extent that it is relevant, I believe a delivery of the kind that occurred here is not the sort of activity in which a manufacturer would typically engage. If that were not so, common carriers would not have such an extensive market for their services in delivering both raw materials and manufactured goods.

23

I am further confident in my interpretation based on how Pennsylvania's court have interpreted a very similar provision of its workers' compensation law, which is the functional equivalent of our KRS 342.610(2)(b). 77 Pa. Stat. Ann. § 461 (Section 302(a)(2)) provides in relevant part as follows:

> A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured its payment as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.
>
> For purposes of this subsection, a person who contracts with another . . . **to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor** . . . .

(Emphasis added).

In *Dobransky v. EQT Prod. Co.,* 273 A.3d 1133, 1148-49 (Pa. Super. 2022), an *en banc* decision, the Court declined to interpret this provision of Section 302(a)(2) expansively to mean that a trucking company, which delivered a key material necessary for another company's business, was thereby entitled to tort immunity as the trucking company's employee's statutory employer. In *Dobransky,* Halliburton Energy Services Inc. (HESI) entered into a contract with Northwest Concrete Products (Northwest) in which Northwest was "to transport the goods or materials tendered to it by [HESI] or any supplier of [HESI] to and from the origin and/or destination points (and stop off points in between) as designated by [HESI]" and to unload goods and materials. HESI supplied "mud services" for EQT Production Co. which was

24

necessary for its drilling and hydraulic fracturing business, with the mud requiring barite as a weighting material. Dobransky was employed as a truck driver by Northwest. When he was unloading the barite he was transporting for HESI into a storage container on site of a natural gas well leased by EQT, the cap of the container blew off, releasing barite onto his face and body, injuring him. *Id.* at 1135-36.

Dobransky received workers' compensation benefits from Northwest and sought tort liability against HESI and EQT. Both companies argued they were his statutory employer and immune from tort liability due to the exclusive nature of the Workers' Compensation Act, claiming that HESI was in the business of providing well site services and a "regular or recurrent" part of that business is delivering and unloading barite for use at well sites. *Id.* at 1144. Dobransky countered that Northwest is in the transportation business and that HESI is not a transporter of barite or any other type of freight.

The Court agreed that HESI and EQT failed to "definitively demonstrate that the transportation and unloading of barite was an aspect of HESI's business or trade, and that HESI contractually delegated that aspect of its business or trade to Northwest." *Id.* at 1146-47. The Court concluded:

> [T]he evidence establishes, at most, that HESI needed barite for making the drilling mud and that it had Northwest transport and deliver barite to it at the well site. However, the fact that an entity contracts with a subcontractor to have materials delivered to it in order to conduct its business or trade does not mean that a part of that entity's business or trade is the transportation and/or shipping of those materials from one place to another. Otherwise . . . any entity that contracts for the regular delivery of materials to use in its business or trade would be the statutory employer of the truck driver(s) delivering such materials to it.

25

*Id.* at 1148 (footnotes and paragraph break omitted).

This interpretation by this Pennsylvania court is highly persuasive in explaining how we should interpret KRS 342.610(2)(b). I am satisfied that Minova is in the manufacturing of resin capsules business, not in the transportation of limestone business. While limestone is a key component needed for Minova's business, the same could be said of many items and materials that companies need in order to run their businesses and I would specifically overrule any Court of Appeals opinions which could be interpreted as holding otherwise.

The majority opinion additionally ignores the economic reality of our times in which employers are becoming more specialized and increasingly divesting their businesses of anything that distracts from their core business, offloading duties to other companies who are specialized in providing such services more efficiently and inexpensively than the employer could do itself (including not having to pay workers' compensation premiums or any other benefit to these other companies' employees). While many years ago a company like Minova may have made the decision to have its own employees transport the limestone, back then it would have been much more typical for a company like Lhoist who mines the limestone to have it delivered to its customers (this is the *Blevins* situation). Today, for a purchaser to pick up a raw material at the mine would be a highly unusual choice. Minova making such a choice to never engage in transporting a needed raw material has consequences to whether it has immunity from Jolly's suit.

26

The immunity extended to up-the-ladder contractors is supposed to be a "quid pro quo for workers' compensation coverage[.]" *Labor Ready, Inc.*, 289 S.W.3d at 206. As Minova does not insure Trimac's employees and pays nothing toward their coverage either as an employer or an insurer and never will, the idea of a "quid pro quo" here is entirely illusory. Instead, pursuant to the majority's ruling, Minova receives immunity without incurring any cost whatsoever. This "free ride" in the face of Jolly's substantial injuries, is unwarranted and unjust.

I can understand the extension of up-the-ladder immunity in a case like *Blevins*, where a coal mining company agreed to sell and deliver coal to the purchaser's facility and contracted with someone who arranged with the owner of several trucks to procure truckers to haul the coal, for in that case selling the coal it mined required delivery and thus the mining and delivery of the product was the coal mining company's business. Similarly, *Thornton v. Carmeuse Lime Sales Corp.*, 346 S.W.3d 297, 299 (Ky. App. 2010), relied on *Blevins* to determine a mining company was engaging in a regular and recurrent part of its business when it engaged a trucking company to deliver lime to its customers.

This is equivalent to the line that Pennsylvania has drawn. In *Six L's P Co. v. Workers' Compensation Appeal Board (Williamson)*, 44 A.3d 1148, 1150, 1159-60 (Pa. 2012), the Court concluded that Six L's, whose business was growing, harvesting, and distributing tomatoes and other produce, and owns and leases various farms and distribution and processing facilities was the

27

statutory employer for a truck driver whose company was uninsured and which was hired to transport Six L's tomatoes between a warehouse and a processing facility (both of which Six L's either owned or leased), because the transportation of the tomatoes was a regular or recurrent part of its business.

I cannot endorse how *Thorton* was extended in *Black v. Dixie Consumer Prods., LLC*, 835 F.3d 579, 585-86 (6th Cir. 2016), and how *Black* was then extended in *Cunningham v. Kroger Ltd. P'ship I.*, 651 S.W.3d 188, 205-06 (Ky. App. 2022). In *Black*, the Sixth Circuit concluded that a truck driver for Western Express who drove a load of raw paper materials (pulpboard) to a Dixie factory for processing into paper cups and plates was "work that Dixie or similar businesses would normally perform or be expected to perform with employees" as demonstrated by testimony by an expert witness that other companies have utilized private fleets of trucks for their transportation needs. 835 F.3d at 586. The Court explained: "Unless Dixie entered the business of producing raw paper . . . , it necessarily needed to receive and unload regular deliveries of paper." *Id.* at 585-86.

In *Cunningham*, Kroger Limited Partnership II (KLP II) entered into a carrier services agreement with Penske in which Penske agreed to accept KLP's freight delivered by third parties to KLP II's facilities and the facilities of all of its divisions, subsidiaries or affiliates, whether owned or leased, and to load, unload, and deliver such freight. A Kroger store owned by Kroger Limited Partnership I (KLP I) received deliveries of milk from a dairy. When the driver for Penske was unloading milk at the store, he was injured when a dock door

28

fell on him. 651 S.W.3d at 201. Cunningham received workers' compensation benefits from Penske but, citing *Black* as analogous, the Court determined that Cunningham was the statutory employee of KLP I and thus could not pursue tort remedies against it. The Court reasoned as follows:

> It is undisputed that KLP I received regular shipments of dairy products from KLP II which KLP I was incapable of producing itself and which had to be received and unloaded in order to conduct its retail grocery business. The evidence was also undisputed that KLP I's own employees actually directed and assisted in the unloading of the deliveries. Penske's deliveries were an integral part of the business of running the grocery store and indisputably meet the standard of KRS 342.610(2)(b).

*Cunningham*, 651 S.W.3d at 205–06. The Court was unmoved by Cunningham's argument that he should be treated the same as a Coca Cola delivery driver who fell on an icy ramp at a Kroger store who was considered an invitee for purposes of tort liability in *Wallingford v. Kroger Co.*, 761 S.W.2d 621 (Ky. App. 1988). The Court in *Cunningham* regarding *Wallingford* opined:

> No mention is made of a workers' compensation immunity defense for Kroger. But if Wallingford had been an employee of a carrier which had a contract with a corporate relative of the Kroger store, to perform the kind of work which was a regular or recurrent part of the business, Kroger may well have pled the defense of statutory immunity.

*Cunningham*, 651 S.W.3d at 206.

I am not convinced by the majority's argument that "the comprehensive and detailed transportation services agreement between Minova and Trimac . . . distinguishes the present appeal from hypothetical situations involving delivery and transport of goods by entities such as 'Amazon, DoorDash, Uber Eats, Office Depot, Lowe's or otherwise[.]'" (Quoting Jolly's brief). How is Kroger any

29

different than the entities mentioned? Kroger is an enormous entity. It had

total company sales of $33.9 billion in the third quarter of 2025.[8] Penske is a

massive company. Its automotive group alone made more than $5 million in

gross profits in 2024.[9] In what hypothetical world would Kroger ever function

to insure Penske?

Every company who manufactures or sells any kind of goods will need to

have items delivered to or from it. Larger, successful companies may have very

detailed contracts with their delivery companies or shippers and small entities

may conversely have much more informal arrangements. Should the large

companies be immunized from tort liability based on a hypothetical chance

that at some time the large carriers it deals with will let their workers'

compensation insurance lapse, while the smaller companies will always be in

the business of insuring their equally small carriers who are less likely to have

insurance?

Were Trimac uninsured, Minova may have quickly declaimed any

responsibility of being an up-the-ladder employer for it. Yet a going concern as

large as Trimac and other common carriers could never get away with not

properly providing workers' compensation insurance to their employees.

---

[8] Kroger Reports Third Quarter 2025 Results and Updates Guidance for 2025, (Dec. 4, 2025), https://ir.kroger.com/news/news-details/2025/Kroger-Reports-Third-Quarter-2025-Results-and-Updates-Guidance-for-2025/default.aspx

[9] Penske Automotive Group, Inc. Common Stock (PAG) Financials, https://www.nasdaq.com/market-activity/stocks/pag/financials (last visited Jan. 21, 2026).

Minova is no more a contractor to Trimac than Doctors' Associates Inc. (DAI) was a contractor to its uninsured Subway franchisee. Minova is in the business of selling resin capsules rather than in the business of hauling materials, here limestone, just as "DAI was in the business of franchising, not the business of selling sandwiches." *Doctors' Assocs., Inc. v. Uninsured Emps.' Fund*, 364 S.W.3d 88, 93 (Ky. 2011). *See also Saladworks, LLC v. W.C.A.B. (Gaudioso)*, 124 A.3d 790, 799 (Pa. Commw. Ct. 2015) (reaching the same conclusion in applying its similar statute).

Franchising cannot be a successful business model without the franchisee making continual payments to the franchisor and in that sense the franchisees are essential to the franchisor, and if there were no franchisors DAI would have to own Subway stores directly to earn profits from each store, but that does not make it a contractor for a particular franchisee. Franchisors are also heavily involved in franchisees' businesses by requiring that they follow a particular business model, with the concomitant involvement of the franchisor in what the franchisee is doing in the franchisor's brand's name, which is similar to the layer of contracts and contacts involving Trimac and Minova to ensure that their business relationship operated smoothly.

I conclude that it is unjust and an unreasonable expansion of the up-the-ladder doctrine to consider Minova as functionally being Jolly's employer on the basis that Trimac is deemed to be Minova's subcontractor. Instead, Minova should be treated as a non-employer for whom summary judgment was wrongfully granted as Jolly may properly assert a tort claim against it. Jolly

31

should be entitled to establish that Minova is legally responsible for his injuries. We ought to carefully consider whether the majority's interpretation of KRS 342.610(2)(b) is the correct one or whether a different interpretation would be more in-line with what the General Assembly intended, given the business realities of today. But at minimum, we should not further expand immunizing companies from bearing the cost of their torts through a legal fiction that only benefits big companies' bottom lines at the expense of innocent injured workers. Accordingly, I would reverse the portion of the majority's opinion affirming the grant of summary judgment to Minova and allow Jolly to pursue a tort recovery against Minova.

Bisig, J., joins.

COUNSEL FOR APPELLANT:

Robert E. Stopher
Boehl Stopher & Graves, LLP

COUNSEL FOR APPELLEE:

Kevin C. Burke
Jamie K. Neal
Burke Neal PLLC

James J. Varellas
Sandra M. Varellas
D. Todd Varellas
Varellas & Varellas PLLC

COUNSEL FOR AMICUS CURIAE, KENTUCKY DEFENSE COUNSEL, INC.:

Joseph A. Wright
Thompson Miller & Simpson PLC

COUNSEL FOR AMICUS CURIAE, KENTUCKY JUSTICE ASSOCIATION:

Paul J. Kelley
Satterley & Kelley, PLLC